## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| **AMERICAN INTERNATIONAL INDUSTRIES, Inc.,** | § § § | |
| **Plaintiff,** | § § | No. CIV. _____ |
| **V.** | § § § | **JURY DEMAND** |
| **TEXAS COMMUNITY BANK, N.A.; DAWN CONDOMINIUMS, L.P.; and WILLIAM PADON** | § § § § | |
| **Defendants.** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, American International Industries, Inc. ("Plaintiff" or "American"), brings this action against Texas Community Bank, N.A. (TXCB"), Dawn Condominiums, L.P., ("Dawn") and William Padon ("Padon") (collectively, the "Defendants"):

### I.    PRELIMINARY STATEMENT AND SUMMARY OF THE ACTION

1.       In 1975, Daniel Dror, Chairman and CEO of American, began a long and fruitful business relationship with Walter Beard. Mr. Dror was so happy with Mr. Beard's performance that he changed banks whenever Mr. Beard would find a new position or move to a different institution, and indeed followed Mr. Beard from Northwest Bank to Royal Oaks Bank to TXCB. Over the course of business relationship spanning more than three decades Mr. Dror came to trust Mr. Beard implicitly, and Mr. Dror and Mr. Beard developed a friendship. When Mr. Dror became Chairman and CEO of American, Mr. Beard became the primary banking contact for American as well. This high degree of trust is the weapon which Walter Beard's superiors at TXCB ultimately used against American to defraud and damage it in excess of $1,000,000.00.

1

2.     In mid-2007 (about the time the banking system "credit crunch" began) the relationship radically changed.  TXCB decided to initiate a scheme for swindling millions of dollars from its longtime customer, American.  TXCB's scam involved several transactions, and the wrongful assistance from Dawn and Pardon.

3.     TXCB's egregious conduct occurred over the course of three significant, distinct, but also intertwined, transactions.  TXCB misled, defrauded, and wrongfully siphoned funds from American resulting in damages in excess of $1,000,000.00.  In one overt act, for example, act in furtherance of its scheme, TXCB failed to disclose substantial conflicts of interest regarding the investment and financing arrangements recommended by TXCB to American.

4.     The three contracts at issue in this lawsuit are by their nature complex. TXCB made certain that such contracts were needlessly complicated and convoluted.

5.     First, TXCB and American reached an agreement whereby TXCB promised to provide a loan to American in exchange for American's willingness to pledge collateral as additional security on a loan to a third party. Once American's real property was secured as collateral by TXCB, TXCB refused to provide the agreed-upon loan.

6.     Second, TXCB agreed in writing that once the balance of a certain third party loan was reduced to a specified amount, TXCB would release its security interest in American's real property. TXCB refused, and continues to refuse, to honor its agreement to provide a release. Such refusal is preventing a sale of the property.

7.     Third, TXCB breached its agreement with American to hold funds securely in American's bank. TXCB debited American's accounts in amounts equal to $349,999.97 without authority or cause. Alternatively, American sues under theories of both conversion and money

2

had and received to recover the $349,999.97, all arising from the same set of facts and circumstances.

8.      TXCB also repeatedly violated the provisions of the Bank Holding Company Act Amendments of 1970 by tying its services with non-traditional banking services, such as offering a loan to American on the condition that American pledge property as collateral for a third party loan.

9.      TXCB conspired with co-defendants to commit fraud against American by misrepresenting the financial health and well-being of Dawn, as well as misrepresenting the nature and quality of the underlying assets consisting of 17 condo units as the Dawn Condominiums in Galveston, Texas (the "Dawn Condos") in an attempt to convince American to act as a guarantor for Dawn's indebtedness to TXCB. Through such conspiracy and misrepresentations, TXCB, William Padon, and Dawn Condominiums, L.P. were able to successfully hoodwink American into pledging $1,750,000.00, which the bank then used as leverage to force American to satisfy the indebtedness of the Dawn.

10.      American seeks relief for its losses and bring claims for conversion, for breach of contract, statutory fraud, common law fraud, conspiracy to commit fraud and violation of the Bank Holding Company Act.

## II.      PARTIES

11.      Plaintiff, American International Industries, Inc., is a Nevada Corporation with is principal place of business in Kemah, Galveston County, Texas.

12.      Defendant, Texas Community Bank, N.A., is a Texas Bank engaged in the business of banking, with its principal place of business located at 6721 McPherson Road,

Laredo, Texas 78041.  Texas Community Bank, N.A., may be served with process by and through its registered agent Richardo Pena, at 6721 McPherson Road, Laredo, Texas 78401.

13.    Defendant, Dawn Condominiums, L.P. is a Texas Limited Partnership with its principal place of business at 10042 Whiteside Lane, Houston, TX 77080.  Its principal asset, which is at the center of two of the three transactions making the basis of the suit, is a condominium project located in Galveston, Texas.  Dawn Condominiums, L.P. may be served with process by and through its registered agent Rosemont Capital Corp., 3118 Richmond Ave., Ste 210, Houston, Texas 77098.

14.    Defendant, William "Billy" Padon is an individual resident of Texas.  He may be served with process at 122 Gessner Rd., Houston, Texas 77024.

### III.    JURISDICTION

15.    This court has jurisdiction pursuant to 12 U.S.C. § 1971 which permits bank customers to seek civil damages when one bank transaction is conditioned on the customer's willingness to complete a second transaction with the same institution, and as an action for damages for fraud, conspiracy, breach of contract, money had and received, conversion, and declaratory judgment regarding certain collateral held by TXCB.  This Court has jurisdiction over the subject matter to this action under 28 U.S.C. § 1331, pursuant to which the United States District Courts have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States.  Moreover, this Court has supplemental jurisdiction over American' state law claims pursuant to 28 U.S.C. § 1367.

16.    This Court has personal jurisdiction over the parties in this action.  The activities giving rise to this action took place in the State of Texas; more particularly, each of the Defendants' acts which violated both federal and state laws and caused damages to American

4

took place within the Southern District of Texas. Further, upon information and belief, each defendant resides or is domiciled within the State of Texas; thus, this Court has personal jurisdiction over each defendant.

## IV.   VENUE

17.   Venue is proper in this the United States District Court for the Southern District of Texas – Galveston Division because a substantial part of the events or omissions giving rise to the claims occurred within the Southern District of Texas pursuant to 28 U.S.C. § 1391(a). Furthermore, the real property, consisting of 17 condo units, owned by Defendant Dawn Condominiums, L.P. which forms a substantial portion of the basis of this suit is located in Galveston, Texas. Additionally, a tract of real property consisting of 286.58 acres forming yet another substantial basis of this civil suit is also located in Galveston County, Texas.

## V.   FACTS

18.   Daniel Dror, Chairman and CEO of American, first met Walter Beard ("Beard") in 1975. American is an investment holding company that is publicly traded. American, in need of a strong contact in the banking industry, had found its man. Indeed, American followed Beard to three different banks as his career advanced, each time bringing a great deal of business to Beard's employer. The reason that American remained loyal to Beard was that Beard remained loyal to American; often times facilitating or funding profitable business opportunities for American through the banking services of whatever bank Beard happened to be working for at that time. American came to trust Beard implicitly and rely on him as its go-to guy for financing or loans.

19.   Once Beard accepted a position at TXCB, American frequently conducted business with TXCB. American participates in a wide variety of business ventures including

property ownership, finance, commercial investments, and various other types of endeavors. For many years, American relied on TXCB to provide financing for various business ventures. However, TXCB was not satisfied with a simple and mutually-beneficial business relationship with American, as other banks had been in the past. TXCB, knowing the high degree of trust between Beard and American, used deceit and corrupt behavior to take advantage of American.

**The Dawn Condominiums Scam**

20.     In late Summer or Fall of 2007, Dror was introduced to William Padon ("Padon") and Kentner Shell ("Shell") by Walter Beard ("Beard") of TXCB. Padon and Shell were principals in Dawn. Beard suggested that American would benefit from business dealings with Padon and Shell through Dawn. During the course of the introduction TXCB represented to American that Dawn was an excellent customer of TXCB with a strong financial outlook and history. TXCB advised that Dawn was looking for a third party to invest in or guaranty its primary venture, the Dawn Condominiums, a condominium project located in Galveston, Texas. Dawn is owned and/or controlled by Padon and Shell.

21.     Upon information and belief, TXCB falsely represented that it had an appraisal in its file which valued the Dawn project at $5,300,000.00, when no such appraisal existed at the time. Representatives of TXCB advised that an investment in Dawn by American would be both profitable and secure based on the due diligence conducted by TXCB and its appraisal. TXCB falsely represented to American that there were three (3) earnest money contracts for individual Dawn condo units ready to close with a purchase price of approximately $300,000.00 each. TXCB made these misrepresentations in a successful effort to convince American to move forward with investing in or guaranteeing loans to the Dawn in order to better secure its own loan, which was in or near default.

6

22.     In reliance on the misrepresentations and self-serving recommendations of the TXCB and Dawn, American agreed to invest in the Dawn Condominiums project owned by Dawn.   American was to receive a fee of $250,000.00 fee in exchange for pledging $1,000,000.00 in certificates of deposit as additional security for a loan by TXCB to Dawn in the original principal sum of $4,035,000.00 ("Dawn Note").  In exchange Dawn was able to free up multiple condo units then-pledged as collateral to TXCB, which were supposedly in demand.  In reality, Dawn was able to free up assets from TXCB, while American footed the bill.  Upon information and belief, only one sale occurred for substantially less than represented, and the transaction was executed as a sham to deceive American.

23.     Immediately prior to the finalization of the loan, and without any advance notice, TXCB demanded that American pledge an additional $750,000.00 as security for the Dawn Note.  American indicated that the demand for an additional $750,000.00 was unacceptable and intended on backing out of the deal.  However, once again American was swayed by the false representations of TXCB, which indicated that based on the appraisal and the escrow contracts, in hand, American could expect a quick return on its investment with little to no risk.  TXCB further represented that the impending sale of the three (3) units would reduce the loan by approximately by $1,000.000.00, and thereby permit TXCB to release funds in the amount of approximately $1,000,000.00 from collateral.

24.     About a year after the Dawn Note was executed, American began to discover that TXCB failed to inform American of certain material facts, known to TXCB prior to recommending that American invest in Dawn.   The following facts were discovered by American in the period from August 2008 through March 2010:

7

   a.  Dawn Condominiums through its affiliate and/or subsidiary, Lakeland Partners, had previously defaulted in a loan owed to Eastern Saving and the Eastern Savings had foreclosed on the project;

   b.  Dawn Condominiums, L.P., was not current on payments due and owing to TXCB and was already in or near default on a separate loan with TXCB;

   c.  There was only one (1) contract in escrow as opposed to three (3);

   d.  William Padon, a principal of Dawn, is a convicted felon;

   e.  TXCB did not have an accurate or valid appraisal on the Dawn condominiums at the time it stated such appraisal was obtained later after the Dawn Note was consummated; and

   f.  Construction on some of the units was not completed and to date remains uncompleted.

25.    Upon information and belief, each and every representation and recommendation made by TXCB that American should invest in the Dawn were part of an elaborate scheme and conspiracy designed to minimize TXCB's exposure on toxic loans TXCB had made to Padon, Shell, and Dawn.  By convincing American to put up its own property as collateral, TXCB was able to reduce its exposure on the Dawn Note from more than approximately $200,000.00 per unit or greater to approximately $112,000.00 per unit.  Furthermore, as a result of access to relevant documentation and discussions with TXCB officials, Defendants Dawn and Padon were party to and aware of all of the false statements made to American by TXCB regarding investment in Dawn, yet did nothing to make the true facts known. TXCB, Dawn and Padon all benefitted financially from these financial shenanigans.

8

26.     When Dawn Condominiums, L.P. was unable to sell its condo units, it subsequently failed to make timely payments on the Dawn Note.  TXCB demanded that American satisfy the Dawn Note or make arrangements to get the Dawn Note off TXCB's books. TXCB represented that if American would not satisfy the Dawn Note, TXCB would offset any losses with the $1,750,000.00 in certificates of deposit ("American CDs") which American had pledged as security for the Dawn Note.  Had American not caved to TXCB's improper demands, American would have lost the American CDs which had been pledged.  Upon information and belief, TXCB had purposefully and knowingly baited American into a bad investment so that TXCB could then set events in motion that would allow it to demand satisfaction of the Dawn Note from American.   Upon information and belief, TXCB had already determined this egregious course of action prior to its insistence upon the additional $750,000.00 CD as collateral.

27.     Upon information and belief, TXCB was aware that Dawn was already in or near default prior to the time it advised American of the investment and through multiple misrepresentations TXCB defrauded American into putting up collateral that could then be seized to offset losses, or alternatively used as leverage to force American to buy the Dawn Note off TXCB's books.

28.     Faced with the possibility of a loss of $1,750,000.00 American was forced to assume payments of the Dawn Note. As a result of the misleading statements and fraudulent conduct of TXCB, American was damaged, in part, in the amount of approximately $250,000.00 in interest payments on the Dawn Note.

9

**Texas Community Bank Reneges on its Pledge**

29.     In late September of 2009, Beard attended a meeting at the offices of TXCB with Roger Lawrence, Chief Executive Officer of TXCB, James Ebrey, Senior Loan Officer of TXCB, and Dror of American. The purpose of the meeting was to discuss the Dawn Note.

30.     At the meeting, Lawrence told Dror that TXCB was feeling uneasy about its exposure from the Dawn Note because TXCB had too many outstanding loans secured by inadequately valued real property.   Lawrence also made American aware that TXCB was under scrutiny by bank examiners for having a high percentage of real estate loans.   Lawrence stated that TXCB would be in a much better position should it be able to rid itself of the Dawn Note (which was secured, in part, by 17 condo units).   Lawrence threatened Dror that TXCB would proceed with cashing in all of the American CDs unless American would satisfy the Dawn Note or find a purchaser to take the Dawn Note off TXCB's books.

31.     TXCB was willing to sell the Dawn Note for $3,850,000.00, estimated then-current value of the note.   American appealed to Southwest Gulf Coast Properties, Inc. ("Gulf Coast") to purchase the Dawn Note, to help American preserve its CDs. Gulf Coast is a Texas corporation with its principal place of business in Kemah, Texas, that deals primarily in property investments.   Gulf Coast agreed to purchase the Dawn Note, in part, because the monthly payment obligation on the Dawn Note would exceed the monthly payment on the loan used to purchase the Dawn Note, thereby increasing the cash flow for the company.

32.     A deal was reached wherein TXCB would loan $3,850,000.00 to Gulf Coast to purchase the Dawn Note from TXCB for $3,781,180.71. Further terms stated that TXCB would discharge all collateral interest in the American CDs once the purchase was consummated.

10

263797.5

33.     However, TXCB demanded collateral for the $3,850,000.00 loan to Gulf Coast ("Gulf Coast Note") consisting of a security interest in a tract of real property owned by American containing approximately 286.58 acres, a first lien on the 17 condo units held under the Dawn Note, and $250,000.00 in a certificate of deposit. TXCB was aware of several assets held by American because of its extensive involvement with the company, and its broad access to the American financial statements and corporate documents. Upon information and belief, TXCB had an appraisal completed on 286.58 acres showing a value of approximately $7,500,000.00 near to the time of the meeting.

34.     At the time of the September 2009 meeting, American owned two additional tracts of real property in the Houston area ("Houston Tracts"). The Houston Tracts were to secure a note owed by American to Sterling Bank in the sum of approximately $1,300,000.00 ("Sterling Note"). American expressed that it would not be willing pledge the 286.58 acre tract as collateral for the Gulf Coast Note because it was not interested in having its three most valuable properties all pledged as collateral for loans.

35.     American stated that Sterling Bank was willing to accept $1,100,000.00 to satisfy the balance of the loan amounting to what would be a discount of $200,000.00 on the Sterling Note. Lawrence, on behalf of TXCB immediately agreed to make the $1,100,000.00 loan to American, to free up the Houston Tracts in exchange for the 286.58 acre tract to be pledged by American as additional collateral on the Gulf Coast Note. TXCB represented that the loan to American in the sum of $1,100,000.00 could be used to pay off the Sterling Note and free up the Houston Tracts. With the Houston Tracts free, American would be willing, under such conditions and with such consideration, to then pledge the 286.58 acre tract as collateral without having all of it properties pledged.

11

36.     Upon information and belief, TXCB had calculated that it stood to gain much more from the 286.58 acre tract, worth more than $2,000,000.00 in excess of the balance of the Gulf Coast Note, as opposed to the American CDs which did not cover the amount of the Dawn Note.  Upon further information and belief, it was TXCB's intention all along to eventually gain ownership interest over the 286.58 acre tract by placing American in a position to forfeit its collateral.  Upon information and belief, such forfeiture of the 286.58 acre property would help TXCB to then meet its capital requirements.

37.     American, relying solely on the representation and commitment of TXCB that a $1,100,00.00 loan would be made to American, executed the documents to pledge the 286.58 acre tract as additional security for the Gulf Coast Note.

38.     Subsequent to the execution, TXCB reneged on its agreement by refusing to make the $1,100,000.00 loan to American to pay the balance of the Sterling Note.  American was on the verge of losing the Houston Tracts.

39.     TXCB proceeded with loaning $1,100,000.00 to  Ken Melber, another customer of TXCB.  Melber had been made aware of the discount offered on the Sterling Note by TXCB. Melber utilized the loan proceeds to purchase the Sterling Note at the agreed discounted price. To add insult to injury, American was then forced to pay  Melber the full amount of the Sterling Note from American.  No such amounts would have been paid by American had TXCB complied with its agreement to loan American funds sufficient to pay Sterling Bank.

40.     Melber benefitted from the loan by obtaining the discount from Sterling Bank and the additional interest on the Note.  Melber's profits were approximately $300,000.00 which should have belonged to American had TXCB fulfilled its agreement.  The resulting damage to American was an approximate loss of $200,000.00 in the form of the discount offered by

12

Sterling Bank for the repayment of the Sterling Note, and an additional approximate $100,000.00 in interest paid to Melber on the balance of the Sterling Note which he now owned.  Further, the American 286.58 acre tract was procured as collateral without due consideration and through fraudulent misrepresentations.

**Texas Community Bank's  Wrongfully Conversion of American's Property**

41.     According to the terms of the Deed of Trust, Security Agreement and Financing Statement (Attached as Exhibit A) executed in conjunction with the Gulf Coast Note, the Grantor (American) shall be entitled to have the 286.58 acre tract released so long as (a) there is no default under the loan and (b) and the Gulf Coast Note had a current unpaid principal balance of less than $850,000.00. *See* ¶ 41, Exhibit A to Plaintiff's Original Complaint.

42.     The current balance of the Gulf Coast Note stands at approximately $3,600,000.00 after TXCB applied the $250,000.00 certificate of deposit to the balance of the loan.

43.     Gulf Coast and Dawn currently have an outstanding offer of $2,800,000.00 for the 17 Dawn Condo units.  If applied to the balance of the Gulf Coast Note, the balance would be reduced to $800,000.00 thus triggering the paragraph 41 release provision whereby TXCB must release all property as collateral. *See* ¶ 41, Exhibit A to Plaintiff's Original Complaint.  As per the terms of the Deed of Trust, Security Agreement and Financing Statement, TXCB must provide releases for both the 286.58 acre tract as well as the 17 condo units.

44.     On May 20, 2011, American provided written notice to TXCB that it must comply with the terms of the Deed of Trust, Security Agreement and Financing Statement and provide releases for the 17 condo units and 286.58 acre tract.

45.    TXCB has indicated that it will provide a release of the 17 condo units, but not the 286.58 acre tract thereby threatening to kill the sale and further damage American in the amount of $2,800.000.00.

46.    American currently has a purchase offer on the 286.58 acre tract for $15,000,000.00. American cannot sell the property so long as TXCB maintains its ill-gotten security interest.

47.    Should TXCB further refuse to comply with the terms of the Note and Deed of Trust, TXCB anticipates substantial damages arising from the lost sale of the condo units and of the 286.58 acre tract itself.

**Texas Community Bank Wrongfully Debits Funds from American**

48.    American was a creditor and shareholder of Hammonds Industries, Inc. ("Hammonds"). Hammonds had a total outstanding indebtedness to TXCB in the amount of approximately $2,700,000.00 (collectively "Hammonds Debt"). American was a guarantor for the loan, which was additionally secured by the assets of Hammonds and its subsidiaries.

49.    In 2009, Fabcorp, Inc. ("Fabcorp"), a fabrication and machining company, commenced negotiations with American to purchase all of the assets of Hammonds and its subsidiaries.

50.    As part of the negotiations, Fabcorp stated that it would not move forward with the purchase of Hammonds unless American agreed to provide a general release for all debts owed to American by Hammonds.

51.    On March 5, 2009, American and Fabcorp reached an agreement in regard to the sale which was memorialized in a letter dated March 5, 2009. Under the agreement, Fabcorp agreed to pay off all Hammonds' debts and assume all obligations and guaranties of American

14

relating to Hammonds. In addition to tendering other valuable consideration, Fabcorp agreed to purchase from TXCB the Hammonds Debt for which American was guarantor. American was then to be released by Fabcorp of all responsibilities of the guarantee. American agreed to the sale of Hammonds, and executed and delivered the general release of Hammonds obligations to American International as requested by Fabcorp.

52.     In conjunction with the closing, Fabcorp purchased the Hammonds Debt. The Loan Sale Agreement (Attached as Exhibit B) stated:

> "The purchase price ... for the Loans shall be the sum of $2,354,537.24. The Purchase Price reflects (i) the sum of the unpaid principal balance of the Notes, accrued and unpaid on the unpaid interest on the unpaid principal balance of the Notes and late fees owing as of the Closing Date, less (ii) a waiver of the late fees in the amount of $3,504.67 and a discount of $350,000.00. On the Closing Date, Buyer shall pay the Purchase Price to Seller, either in cash or by wire transfer in immediately available funds. All payments from any Debtor relating to the Loans, including principal and interest, made prior to the Closing shall belong to Seller. All such payments made after the Closing shall belong to buyer." *See* Exhibit B to Plaintiff's Original Complaint.

53.     Upon the purchase of the Hammonds Debt, Fabcorp became the owner and holder and released American from all liability under the Note, pursuant to the terms of the agreement.

54.     On April 15, 2009 TXCB closed the Loan Sale Agreement with Fabcorp. On April 16, 2009 TXCB debited funds in the amount of $349,999.97 from an account held by American. TXCB chose to sell the Hammonds Debt to Fabcorp at a discount and no longer possessed a legal right to receive payment on the Hammonds Debt as per the terms of the Loan

Sale Agreement. *See* Section 8.2.2 of the Loan Sale Agreement makes clear that the TXCB is selling the entirety of the note and states "[s]eller has not modified the notes or any of the other loan documents or satisfied, canceled, or subordinated the note or any of the other loan documents in whole or in part or released any of the Collateral from the Liens or executed any instrument of release, cancellation, or satisfaction." *See* Exhibit B to Plaintiff's Original Complaint.

55.     Upon information and belief, after TXCB has second thoughts about the deal it has struck with Fabcorp. TXCB regretted the decision that resulted in a loss and wanted to "un-do" the deal. TXCB devised a way to coerce American into making up for TXCB's loss. TXCB sought to recoup the loss by debiting the exact amount of the loss from an account held by American. TXCB was in powerful position over American, with the ability to call in debt or cash in collateral worth significantly more than the $349,999.97 (namely the 286.58 acre tract of property worth in excess of $7,000,000.00). TXCB took advantage of the knowledge that American was not likely to pick a fight when it had much more to lose should TXCB decide to abuse its power position.

56.     TXCB, without justification or authorization, wrongfully withdrew the sum of $349,999.97 from an operating account which was maintained at TXCB by American to cover its losses from a bad deal.

## VI.     CAUSES OF ACTION

57.     American hereby incorporates by reference all the foregoing and following paragraphs of this Complaint as if fully set forth herein in each and every cause of action.

## A.  Count 1 – Conversion of Funds Against Texas Community Bank

16

58.     In Texas, the elements of conversion of funds are (1) the plaintiff owned, possessed, or had the right to immediate possession of property; (2) the property was personal property; (3) the defendant wrongfully exercised dominion or control over the property; and (4) the plaintiff suffered injury. *Lopez v. Lopez*, 271 S.W3d 780, 784 (Tex. App.–Waco 2008, pet. Denied).

59.     American was the rightful owner and retained the right of immediate possession of the $349,999.97 deposited in it account at Texas Community Bank.

60.     The property consisted of $349,999.97 and was personal property. Furthermore, the $349,999.97 was (1) delivered to TXCB for safekeeping; (2) intended to be kept separate in an account designated for American; (3) substantially in the form in which it was delivered; and (4) not subject to a title of claim by its keeper.

61.     Texas Community Bank wrongfully exercised dominion or control over the property resulting in injury to American.

## B. Count 2 - Breach of Contract Against Texas Community Bank

62.     In Texas, the elements of breach of contract are (1) there is a valid, enforceable contract; (2) the plaintiff is a proper party to sue for breach of contract; (3) the plaintiff performed its contractual duties; (4) the defendant breached the contract; and (5) the defendant's breach caused the plaintiff injury. *McLaughlin, Inc. v. Northstar Drilling Techs.*, 138 S.W.3d 24, 27 (Tex. App.–San Antonio 2004, no pet.)(elements 1, 3-5), *see also Mandell v. Hamman Oil & Ref. Co.*, 822 S.W.2d 153, 161 (Tex. App.–Houston [1st Dist.] 1991, writ denied) (element 2).

### i.     Wrongfully Withdrawing Funds

63.     American and Defendant TXCB executed a valid and enforceable written agreement wherein American would employ the banking services of TXCB. The agreement was

17

such that TXCB was tasked, as any other financial institution would have been, with safekeeping of American's funds.  In consideration for safekeeping American's funds and paying interest to American for such funds, TXCB would increase its capital reserves and be able to make loans and charge higher interest than what it was paying to American, thereby making a profit.

64.     American fully performed its contractual obligations by tendering the funds to TXCB, and executing any and all necessary agreements corollary to American's deposit.

65.     Defendant TXCB materially breached the contract by withdrawing and keeping funds from American's account without any authority or consent to do so.

66.     American was damaged in the amount of $349,999.97 plus interest that would have been earned on said funds over the course of 26 months as of the present date.

### ii.    Refusal to Loan American Funds

67.     American and Defendant TXCB negotiated a binding agreement whereby American would pledge the 286.58 acre tract as additional collateral for the Gulf Coast Note if TXCB agreed to loan American funds to satisfy the Sterling Note.

68.     American fully performed its contractual obligations by executing the documentation necessary to pledge the 286.58 acre tract as collateral.

69.     TXCB materially breached the contract by refusing to loan American $1,100,000.00 to satisfy the Sterling Loan, and thereby failed to provide the full agreed upon consideration to American.

70.     Defendant TXCB's breach resulted in damages to American.

### iii.   Refusal to Provide Release of Security Interest on 286.58 Acre Tract

71.     American and Defendant TXCB negotiated an enforceable agreement whereby American would pledge the 286.58 acre tract as additional collateral for the Gulf Coast Note.

18

Pursuant to the terms of that agreement, when the outstanding balance of the loan reached less than $850,000.00, TXCB was to release any and all security interest in the collateral under the Gulf Coast Note.

72.    American fully performed its contractual obligations by executing the documentation necessary to pledge the 286.58 acre tract as collateral. Further, a buyer has come forward willing to purchase the 17 condominium units for $2,800,000.00, thereby reducing the Gulf Coast Note balance to $800,000.00.

73.    TXCB has refused to release its security interest in the 286.58 acre tract despite its contractual obligation to do so, and therefore is in breach of contract.

74.    Defendant TXCB's breach has resulted in damages to American, and will cause further damage should Defendant continue to remain in breach.

## C.  Count 3 - Money Had and Received against Texas Community Bank

75.    In Texas, to recover under a claim for money had and received a plaintiff must show (1) that the defendant holds money and (2) that the money belongs to the plaintiff in equity and good conscience. *Staats v. Miller*, 243 S.W.2d 686,687-88 (Tex. 1951).

76.    Defendant Texas Community Bank currently holds the balance of the approximately $349,999.97 wrongfully withdrawn from the account of American, without authorization or legal authority to do so.

77.    The approximately $349,999.97 belongs to American in equity and good conscience.

## D.  Count 4 – Statutory Fraud Against Texas Community Bank, Dawn and Padon

78.    Section 27.01(a) and (c) of the Texas Business and Commerce Code concerns primary violation of fraud in real estate and stock transactions.  A defendant is liable if the

19

defendant makes false representations of past or existing facts that were (1) made to induce the plaintiff into purchasing the property and (2) were relied upon by the plaintiff.

79.     TXCB and Dawn both made misrepresentations about the Dawn Condominiums project for the purpose of enticing American into the deal.   American relied upon these misrepresentations when making a decision to purchased a portion of this real estate project. TXCB and Dawn are each liable to American for damages.

80.     Section 27.01(d) provides that a defendant is liable if (1) the defendant had actual knowledge of the falsity of the misrepresentations by the primary violator(s); (2) failed to disclose the falsity of the representations; and (3) benefitted from the false representations.

81.     Padon meets all three criteria for liability under Section 27.01(d).   Additionally, TXCB and Dawn meet these criteria to the extent they are not primary violators.

82.     For either primary or secondary violations, American is entitle to damages, reasonable and necessary attorney's fees expert witness fees, costs for copies of depositions and costs of court under Sections 27.01(b) and (e).

## E.   Count 5 – Common Law Fraud Against Texas Community Bank, Dawn and Padon

83.     In Texas, a plaintiff must prove the following elements to recover for fraud against a defendant: (1) defendant made a misrepresentation to the plaintiff; (2) the representation was material; (3) the representation was false; (4) when the defendant made the representation, he knew the representation was false or made the representation recklessly, as a positive assertion and without knowledge of its truth; (5) the defendant made the representation with the intent that the plaintiff act on it; (6) the plaintiff did rely on the representation; and (7) the representation caused injury to the plaintiff. *In re FirstMerit Bank*, 52 S.W.3d 749, 758 (Tex. 2001).

20

263797.5

84.     Due to the nature and length of the relationship between Defendant TXCB and American, TXCB had, at all times, a duty to make accurate and truthful representations in the course of its dealings with American.

85.     TXCB, by and through its agents and representatives, made false representations to American regarding strength and soundness of the Dawn as a potential financial investment. In the late-summer of 2007, during the introduction of Dror to Padon and Shell, a representative of TXCB made misrepresentations regarding the financial outlook and history, which is further explained *supra*. These material misrepresentations were made over the course of several meetings at TXCB facilities commencing in September 2007 and ending in March of 2010 and in conversations with agents and representatives of TXCB.  Further, such misrepresentations were made by TXCB prior to American' involvement in the Dawn, and disguised the true nature of the Dawn as being in default and having no prospect for future income from condo sales. TXCB additionally misrepresented the value of the underlying Dawn asset of 17 condo units, and failed to disclose that several units were not completed. TXCB, knowing full well that Padon was a convicted felon, represented that American's money would be safe in his and Dawn's hands. Further, TXCB failed to satisfy its affirmative duty to disclose its conflict of interest in advising American to participate in an investment that TXCB was simultaneously trying to rid itself of.

86.     TXCB knew each and every one of the representations, as described above, to be false when made, as shown by the clear evidence regarding the then-current default status of the Dawn, the lack of existing contracts on condo units in contravention of TXCB's representation, and the failure of TXCB to disclose its conflict of interest.

21

87.     Defendant intended for American to rely on, or had reason to expect American would act in reliance on, the false representations.

88.     American relied on Defendant TXCB's false representations by moving forward with the investment in the Dawn. TXCB's false representations directly and proximately caused injury to American, which resulted in damages.

**F.  Count 6 - Conspiracy to Commit Fraud against All Defendants**

89.     For a plaintiff to recover under a theory of conspiracy to commit fraud in Texas, it must show the defendant: (1) the defendant was a member of a combination of two or more persons; (2) that the objective of the combination was to accomplish an unlawful purpose or a lawful purpose by unlawful means; (3) the members had a meeting of the minds on the object or course of action; (4) one of the members committed an unlawful, overt act to further the object or course of action; and (5) the plaintiff suffered injury as a proximate result of the wrongful act. *Chon Tri. V. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005). For the purposes of defining what is considered a "person" in conjunction with an action for fraud, the Supreme Court of Texas has affirmed that business can conspire with each other or with individual persons. *Berry v. Golden Light Coffee Co.*, 327 S.W.2d 436, 440 (Tex. 1959).

90.     Defendants TXCB, the Dawn, and Padon have engaged in overt acts constituting conspiracy to commit fraud. TXCB deliberately misled American as to the strong economics of Dawn and Padon. Specifically, TXCB represented that three (3) units were under contract to be sold in conjunction with its advice to invest in the Dawn. Furthermore, TXCB deliberately withheld information regarding the default status of the Dawn's various loans. TXCB additionally failed to disclose its conflict of interest arising from its own potential exposure to financial loss due to the Dawn and Padon being in default. At all times, the Dawn and Padon

22

were aware of the misrepresentations made by TXCB and did not contradict the fraudulent information disseminated by TXCB.

91.     By agreeing to and acting on this unlawful misrepresentation of strong financial status, Defendants were members of a combination of whose object was to accomplish an unlawful purpose – namely to defraud American.

92.     The facts create the inference that Defendants TXCB, Dawn, and Shell reached a meeting of the minds regarding the course of action to be taken against American, and in subsequently following that course of action by tricking American into proffering capital to invest, Defendant TXCB committed unlawful, overt acts, to further their unlawful purpose consisting of making the actual misrepresentations to American.

93.     As a result of the conspiracy and various misrepresentations and other illegal acts such as the violation of the Bank Holding Company Act, as pled infra, American suffered financial injury as a direct and proximate result.

## G.  Count 7 - Violations of the Bank Holding Company Act Amendments of 1970 against Texas Community Bank

94.     12 U. S. C. §§ 1971, et seq., also known as the Bank Holding Company Act, permits bank customers to seek civil damages when one transaction is conditioned on the customer's willingness to complete a second transaction with the same institution. *See United States v. Beuttenmuller*, 29 F.3d 973, 977 n. 8 (5th Cir.1994).

95.     12 U. S. C. §§ 1971 (b)(1) provides that a bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement— Subsection A provides that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service; Subsection C provides that the customer provide some

23

additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service.

96.     TXCB's conduct arising from its business dealings with American constitute violations of the Bank Holding Company Act and resulting in damages. Specifically, TXCB violated 12 U. S. C. §§ 1971(A) and (C) by furnishing services, and varying the consideration for credit and services, on the condition that American locate a purchaser for the Dawn Note, or satisfy the balance of the Dawn Note or forfeit $1,750,000.00 in certificates of deposit. TXCB further conditioned extending credit to satisfy the balance of the Sterling Note on American pledging its 286.58 as collateral on a loan made to Gulf Coast, a third party. Because TXCB conditioned banking favorable banking services on American' participation in non-traditional bank services such as providing collateral to a third party, TXCB's conduct violates 12 U. S. C. §§ 1971(A) and (C).

97.     12 U. S. C. §§ 1971 (e) further provides that "any person who is injured in his business or property by reason of anything forbidden in subsection (b) may sue therefore in any district court of the United States in which the defendant resides or is found or has an agent, without regard to the amount in controversy, and shall be entitled to recover three times the amount of the damages sustained by him, and the cost of suit, including a reasonable attorney's fee."

## VII.   REQUEST FOR DECLARATORY JUDGMENTS

98.     American hereby incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

99.     Pursuant to the Uniform Declaratory Judgments Act, TEX. CIV. PRAC. & REM. CODE, Chapter 37, American seeks a declaration that Defendant TXCB acquired its interest in

24

263797.5

the 286.58 acre tract as collateral through fraudulent means, and is therefore not entitled to any interest in the property.

## VIII.  ATTORNEY'S FEES

100.  American hereby incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

101.  American is entitled to recover reasonable and necessary attorney's fees under Texas Civil Practice & Remedies Code Chapter 38.001(8) because this is a suit on a written contract.

102.  Further, 12 U. S. C. §§ 1971 (e) further provides that "any person who is injured in his business or property by reason of anything forbidden in subsection (b) may sue therefore in any district court of the United States in which the defendant resides or is found or has an agent, without regard to the amount in controversy, and shall be entitled to recover three times the amount of the damages sustained by him, and the cost of suit, including a reasonable attorney's fee." (Emphasis provided).

## IX.    CONDITIONS PRECEDENT

103.  American hereby incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

104.  All conditions precedent have been performed or have occurred.

## X.     EXEMPLARY DAMAGES

105.  Pursuant to TEX. CIV. PRAC. & REM. CODE § 41.003(a) punitive damages may be awarded if, proven by clear and convincing evidence, the wrong was accompanied by an aggravating circumstance, such as malice, fraud, willful conduct, or gross negligence.  The

instant facts provide, upon examination of the evidence, that Defendants engaged in fraud and conspiracy to commit fraud willfully, maliciously, and wanton disregard of state and federal law.

## XI. LIMITATIONS CAP EXCEPTIONS

106.    Pursuant to TEX. CIV. PRAC. & REM. CODE § 41.008 statutory limitations on exemplary damages do not apply to a plaintiff who seeks recovery of exemplary damages based on conduct described as a felony in the specific sections of the penal code.  Defendants TXCB, Padon, and Dawn engaged in conduct engaged deemed to be a felony in Texas Penal Code 32.46 (securing execution of a document by deception) and Chapter 31 (theft of property with a value in excess of $100,000.00 constituting a third degree felony or greater).  Namely, TXCB secured Americans execution of documents guaranteeing $1,750,000.00 in CDs on the Dawn Note and documents pledging the 286.58 acre tract as collateral through deception.  Further, TXCB effectively stole $349,999.97 from American by wrongfully debiting its account without authority or cause.  Therefore, any statutory limitations on the dollar amount which may be awarded for exemplary damages would not apply to the instant case.

## XII. JURY DEMAND

107.    Plaintiff hereby demands trial by jury.

## XIII. PRAYER

Wherefore, American prays that judgment be rendered against Defendants and in favor of American for all damages and relief requested herein, including:

a.  All direct, consequential and special damages;

b.  All interest provided by statute  including pre-judgment and post-judgment interest;

c.  All equitable relief to which it may be entitled;

d.  Exemplary damages;

26

263797.5

e.   Treble damages;

f.   Attorneys' fees and legal expense (including expert fees);

g.   The court's declaration that the 286.58 acre tract is legally free and clear of encumbrances by TXCB or its subsidiaries, affiliates, or successors in interest because any and all interest in the property by TXCB or the like was procured through fraudulent means; and

h.   Costs of Court.

American further prays for general relief and such other and further monetary or equitable relief to which it may be entitled at law or in equity.

DATED this **23ʳᴰ** day of June, 2011.

Respectfully submitted,

**GREER HERZ & ADAMS, L.L.P.**

**Andrew J. Mytelka**
State Bar No. 14767700
Fed Bar No. 11084
**Austin L. Webber**
State Bar No. 24066271
Fed Bar No. 1079582
One Moody Plaza, 18th Floor
Galveston, Texas  77550
(409) 797-3200
(409) 766-6424 (FAX)

**ATTORNEYS FOR PLAINTIFF AMERICAN INTERNATIONAL INDUSTRIES, INC.**

27

263797.5

# EXHIBIT A

# DEED OF TRUST,
## SECURITY AGREEMENT
## AND
## FINANCING STATEMENT

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

Date: _____September 30_____, 2009

Grantor(s): AMERICAN INTERNATIONAL INDUSTRIES, INC., a Nevada Corporation

Grantor's Mailing Address (including county):   601 Cien Street, Suite 235, Kemah, Texas 77565 (Galveston County)

Trustee: JAMES EBREY

Trustee's Mailing Address (including county):   16610 Interstate 45, The Woodlands, Texas 77384 (Montgomery County)

Beneficiary: TEXAS COMMUNITY BANK, N.A.

Beneficiary's Mailing Address (including county): 16610 Interstate 45, The Woodlands, Texas 77384 (Montgomery County)

Note(s)

      Date: Of even date herewith.

      Amount:   $3,850,000.00

      Maker:   SOUTHWEST GULF COAST PROPERTIES, INC., a Texas Corporation

      Payee:   TEXAS COMMUNITY BANK, N.A.

      Final Maturity Date: On or before three (3) year(s) from date thereof.

      Terms of Payment (optional): As therein provided.

      Property (including any improvements): A 286.58 acre tract of land, more or less, in the John W. Lyttle League, Abstract 17, GALVESTON County, Texas, being a portion of that 845.10 acre tract of land as described in a Deed recorded in Volume 1225, Page 390, of the

GALVESTON County, Deed Records; being more particularly described by metes and bounds attached hereto as Exhibit "A", together with all right, title, interest, and privileges of Grantor in and to: (i) all streets, ways, roads, alleys, easements, rights-of-way, licenses, rights of ingress and egress, vehicle parking rights and public places, existing or proposed, abutting, adjacent, used in connection with or pertaining to such real property or the improvements thereon; (ii) any strips or gores of real property between such real property and abutting or adjacent property; (iii) all water and utility rights and capacity (including without limitation, any and all reimbursement rights relating to any utilities), mineral and mineral rights, timber and crops pertaining to such real property; (iv) all appurtenances and all reversions and remainders in or to such real property; (v) any and all building materials, fixtures, improvements, equipment, goods, personal property and other property described herein; (vi) all plans and specifications, permits and licenses for development of or construction of improvements on the Property; (vii) all contracts and subcontracts relating to the development of or construction of improvements on the Property; and (viii) all franchises, certificates and other rights and privileges obtained in connection with the Property.

Prior Lien(s) (including recording information): None.

Other Exceptions to Conveyance and Warranty: N/A

For value received and to secure payment of the note and any other indebtedness now or hereafter secured hereby, Grantor conveys the property to Trustee in trust. Grantor warrants and agrees to defend the title to the property. If Grantor performs all the covenants and pays the note and all other indebtedness secured hereby according to its terms, this deed of trust shall have no further effect, and Beneficiary shall release it at Grantor's expense.

**Grantor's Obligations**

Grantor agrees to:
1.   keep the property in good repair and condition;
2.   pay all taxes and assessments on the property before delinquency;
3.   defend title to the property and preserve the lien's priority as it is established in this deed of trust;
4.   maintain, in a form acceptable to Beneficiary, an insurance policy that:
    a.   covers all improvements for their full insurable value as determined when the policy is issued and renewed, unless Beneficiary in its sole and absolute discretion approves a smaller amount in writing;
    b.   contains an 80% coinsurance clause;
    c.   provides all-risk coverage;
    d.   protects Beneficiary with a standard mortgage clause;
    e.   provides flood insurance at any time the property is in a flood hazard area; and
    f.   contains such other coverage as Beneficiary may require;
5.   comply at all times with the requirements of the 80% coinsurance clause;
6.   deliver the insurance policy to Beneficiary within ten days of the date of this deed of trust and deliver renewals to Beneficiary at least ten days before expiration;
7.   keep any buildings occupied as required by the insurance policy;
8.   if this is not a first lien, pay all prior lien notes that Grantor is personally liable to pay and abide by all prior lien instruments;

2

9.   obey all laws, ordinances and restrictive covenants applicable to the property; and

10.  notify Beneficiary of any change of address.

**Beneficiary's Rights**

1.   In the case of the death, inability, refusal or incapacity of the herein named Trustee to act, or at the option of any Beneficiary at anytime and without cause or notice, a successor or substitute of Trustee may be named, constituted and appointed.  Successor or substitute trustees may be named, constituted and appointed without procuring the resignation of the former Trustee and without other formality then execution and acknowledgment by Beneficiary of a written instrument appointing and designating such successor or substitute trustee, whereupon such successor or substitute trustee shall become vested with and succeed to all of the rights, titles, privileges, powers and duties of the Trustee named herein.  Such right of appointment of a substitute trustee shall exist as often and whenever for any of said causes the original or successor or substitute trustee cannot or will not act or has been removed as herein provided.

2.   If the proceeds of the note are used to pay any debt secured by prior liens, Beneficiary is subrogated to all of the rights and liens of the holders of any debt so paid.

3.   Beneficiary may apply any proceeds received under the insurance policy in its sole discretion either to reduce the note or to repair or replace damaged or destroyed improvements covered by the policy.  This provision shall not create any duty on the part of the Beneficiary to collect insurance proceeds and the Beneficiary shall not be responsible for the failure to collect the same regardless of the cause of such failure.

4.   If Grantor fails to perform any of Grantor's obligations, Beneficiary may perform those obligations (having no obligation to so perform) and be reimbursed by Grantor on demand at the place where the note is payable for any sums so paid, including attorney's fees, plus interest on those sums from the dates of payment at the rate stated in the note for matured, unpaid amounts.  The amount to be reimbursed shall be secured by this deed of trust.

5.   If Grantor defaults on the note or fails to perform any of Grantor's obligations or if default occurs on a prior lien note or other instrument or if default occurs under any indebtedness secured hereby, whether or not, incurred by Grantor, and the default continues after the expiration of any applicable notice and cure period as may be required by law or by written agreement, if any, then Beneficiary may:

    a.   declare the unpaid principal balance and earned interest on the note immediately due;

    b.   request Trustee to foreclose this lien, in which case Beneficiary or Beneficiary's agent shall give notice of the foreclosure sale as provided by the Texas Property Code as then amended; and

    c.   purchase the property at any foreclosure sale by offering the highest bid and then have the bid credited on the note.

6.   Notwithstanding the terms of the note to the contrary, and unless applicable law prohibits, all payments received by Beneficiary from Grantor with respect to the note or this deed of trust may, at Beneficiary's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Beneficiary with respect to the note, to be applied to late charges, principal, or interest in the order Beneficiary in its discretion determines.

**Trustee's Duties**

If requested by Beneficiary to foreclose this lien, Trustee shall:

1.   either personally or by agent give notice of the foreclosure sale as required

3

by the Texas Property Code as then in effect;

      2.    sell and convey all or part of the property "AS IS" to the highest bidder for cash with a general warranty of title binding Grantor, subject to prior liens and to other exceptions to conveyance and warranty and without representation or warranty, express or implied;

      3.    from the proceeds of the sale, pay, in this order:

          a.    expenses of foreclosure, including a commission to Trustee of 5 % of the bid;

          b.    to Beneficiary, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;

          c.    any amounts required by law to be paid before payment to Grantor;

          d.    to Grantor, any balance; and

      4.    be indemnified, held harmless, and defended by Beneficiary against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

**General Provisions**

      1.    If any of the property is sold under this deed of trust, Grantor shall immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor shall become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

      2.    Recitals in any Trustee's deed conveying the property will be presumed to be true.

      3.    Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

      4.    This lien shall remain superior to liens later created even if the time of payment of all or part of the note is extended or part of the property is released.

      5.    If any portion of the note cannot be lawfully secured by this deed of trust, payments shall be applied first to discharge that portion.

      6.    Grantor assigns to Beneficiary all sums payable to or received by Grantor from condemnation of all or part of the property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the property. After deducting any expenses incurred, including attorney's fees, Beneficiary may release in its sole discretion and at its option either any remaining sums to Grantor or apply such sums to reduce the note. Beneficiary shall not be liable for failure to collect or to exercise diligence in collecting any such sums. Grantor will immediately give Beneficiary notice of any actual or threatened proceedings for condemnation of all or any part of the property.

      7.    Grantor assigns to Beneficiary absolutely, not only as collateral, all present and future rent and other income and receipts from the property. Grantor warrants the validity and enforceability of the assignment. Grantor may as Beneficiary's licensee collect rent and other income and receipts as long as Grantor is not in default under the note or this deed of trust. Grantor will apply all rent and other income and receipts to payment of the note and performance of this deed of trust, but if the rent and other income and receipts exceed the amount due under the note and deed of trust, Grantor may retain the excess. If Grantor defaults in payment of the note or performance of this deed of trust, Beneficiary may terminate Grantor's license to collect and then as Grantor's agent may rent the property if it is vacant and collect all rent and other income and receipts. Beneficiary neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the property. Beneficiary may exercise Beneficiary's rights and

remedies under this paragraph without taking possession of the property. Beneficiary shall apply all rent and other income and receipts collected under this paragraph first to expenses incurred in exercising Beneficiary's rights and remedies and then to Grantor's obligations under the note and this deed of trust in the order determined by Beneficiary. Beneficiary is not required to act under this paragraph, and acting under this paragraph does not waive any of Beneficiary's other rights or remedies. If Grantor becomes a voluntary or involuntary bankrupt, Beneficiary's filing a proof of claim in bankruptcy will be tantamount to the appointment of a receiver under Texas law.

8.      Interest on the debt secured by this deed of trust shall not exceed the maximum amount of non-usurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount shall be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess shall be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides other provisions in this and all other instruments concerning the debt.

9.      When the context requires, singular nouns and pronouns include the plural.

10.     The term *note* includes all extensions, modifications and renewals of the note and all amounts secured by this deed of trust.

11.     This deed of trust shall bind, inure to the benefit of, and be exercised by successors in interest of all parties.

12.     If Grantor and Maker are not the same person, the term *Grantor* shall include Maker.

13.     In no event may this deed of trust secure payment of an debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

14.     The term "property" includes the real property described herein and all buildings and improvements now existing or hereafter constructed or placed thereon, inclusive of, but not limited to, manufactured homes, and all building material, machinery, apparatus, equipment, inventory, personal property, appliances, and fixtures, of every kind and nature, whatsoever, now in, a part of, affixed to, delivered to or used in connection with any such improvements, inclusive of all goods which are or are to become fixtures, now or hereafter located in or about such improvements, including specifically, without limitation, all heating, air conditioning, ventilating, plumbing, electrical fixtures and wiring, replacements thereof and additions thereto, all of which Grantor represents and agrees are and will be a part of and affixed to the property.

15.     It is understood and agreed that by this instrument, Grantor, in addition to fixing and creating a deed of trust lien upon and against the real property and personal property herein described, inclusive of all goods which are or are to become fixtures thereon, has also created and granted to Beneficiary pursuant to the Uniform Commercial Code of Texas, a security interest in all of the property as herein described, and in the event of a foreclosure sale, whether made by the Trustee or Substitute Trustee, under the terms of this deed of trust, or under judgment of a Court, all property herein described may, at the option of the Beneficiary, be sold as a whole, and that it shall not be necessary to have present at the place of sale the property or any part thereof.

16.     Beneficiary may remedy any default, without waiving same, or may waive any default without waiving any prior or subsequent default.

17.     It is understood and agreed that the proceeds of the note described herein, to the extent that the same are utilized to take up any outstanding liens and charges against the property, or any portion thereof, have been advanced by Beneficiary at Grantor's request, and

upon Grantor's representation that such amounts are due and payable. Beneficiary shall be subrogated to any and all rights, superior titles, liens and equities, owned or claimed by any owner or holder of such outstanding liens however remote, regardless of whether such liens are acquired by assignment or are released by the holder thereof upon payment.

18.     The parties hereto agree that this deed of trust, or any executed copy hereof, may be submitted for filing as a Financing Statement in any jurisdiction in which the Beneficiary so elects. Any copy of this deed of trust which is signed by the Grantor and filed for record in the Official Public Records of Real Property for the County or Counties in which the property is located, shall serve as a Financing Statement under the Uniform Commercial Code as adopted by the State of Texas, between the Grantor, as debtor, whose address is set out above, and the Beneficiary, as secured party, whose address is set forth herein. Further information regarding the security interest herein evidenced may be obtained from Beneficiary at the above address. Notwithstanding anything contained herein to the contrary, Grantor hereby authorizes Beneficiary to file all UCC Financing Statement forms, including, but not limited to, form UCC-1 and form UCC-3 covering all collateral listed therein or in any attachments thereto, along with all attachments thereto with any and all filing entities that Beneficiary deems necessary, at Grantor's expense. The Grantor authorizes the Beneficiary to file one or more financing or continuation statements, and amendments thereto, relating to all or any part of the collateral without the signature of Grantor, where permitted by law. Grantor shall immediately give written notice to Beneficiary of any and all changes to Grantor's name, organizational status, state of organization, organization's chief operating office, and any other change that would affect the validity of any financing statement filing or perfection of lien.

19.     If any portion of the indebtedness secured hereby cannot be lawfully secured by this deed of trust because, including, but not limited to, all or a portion of the indebtedness secured hereby is classified as a loan made pursuant to applicable provisions of the Texas Finance Code, and such classification results in a prohibition against pledging real property to secure such loan(s), the first installments and other payments made under this deed of trust shall be applied to the discharge of the unsecured portion of the indebtedness secured hereby, and payments thereafter shall be applied to the discharge of the secured portion of the indebtedness.

20.     At the request of Beneficiary at anytime, Grantor shall make an initial deposit in a reasonable amount to be determined by Beneficiary and then pay to Beneficiary monthly on such date as Beneficiary shall designate and until the note is paid in full, a sum (the "Funds") equal to one-twelfth (1/12th) of the yearly taxes and assessments plus one-twelfth (1/12th) of yearly premium installments for hazard insurance, if any, all as reasonably estimated, from time to time, by Beneficiary on the basis of assessments and bills therefore received and reasonable estimates thereof. Grantor hereby authorizes Beneficiary, at their sole and absolute discretion to apply the Funds to pay said taxes, assessments, and insurance premiums. The Funds are pledged as additional security for the sums secured by this deed of trust. If the amount of the Funds held by Beneficiary are not sufficient to pay taxes, assessments, and insurance premiums as they fall due, the Grantor shall pay to Beneficiary any amount necessary to make up such deficiency within thirty (30) days from the date notice is mailed by Beneficiary to Grantor requesting payment thereof. Upon payment in full of all sums secured by this deed of trust, Beneficiary shall promptly return to Grantor any Funds held by Beneficiary.

21.     Upon the sale, exchange, assignment, conveyance, mortgage or other transfer of all, part of, or any interest in said property, or of all or any part of the beneficial ownership interest in Grantor (if Grantor is a corporation, partnership, trust or other legal entity), then Beneficiary may, at Beneficiary's option, pursue any and all of Beneficiary's rights, remedies and recourses set forth herein, including the acceleration of maturity of any indebtedness secured

hereby which right of acceleration is hereby expressly granted. Beneficiary shall not pursue such rights, remedies and recourses if Beneficiary consents in writing to the sale, exchange, assignment, conveyance or other transfer in question. It is expressly agreed that in connection with determining whether to grant or withhold such consent Beneficiary may, inter alia (i) consider the proposed transferee's credit worthiness and its management ability in respect of said property, (ii) consider whether or not its security for repayment of the indebtedness secured hereby, or its ability to realize upon such security, will be impaired in any way by the proposed transfer, (iii) require, as a condition to granting such consent, an increase in the rate of interest payable under the indebtedness secured hereby, (iv) require that Beneficiary be reimbursed for all costs and expenses reasonably incurred by Beneficiary in investigating the credit worthiness and management ability of the proposed transferee and in determining whether its security will be impaired by the proposed transfer, (v) require the payment to it of a transfer fee to cover the cost of documenting the transaction on its books, (vi) require the payment of all of its attorney's fees incurred in connection with such sale, exchange, assignment, conveyance or other transfer, (vii) require the expressed assumption of payment of the indebtedness secured hereby and of the performance of the obligations by the transferee (with or without the release of Grantor from liability thereof), (viii) require the execution of an assumption agreement, modification agreement, supplemental security documents and financing statements satisfactory in form and substance to Beneficiary, (ix) require endorsements to any existing mortgagee title insurance policies issued in respect of the said property or the indebtedness secured hereby, and (x) require additional security for the payment of the indebtedness secured hereby in performance of the obligations set forth herein.

22.    On or before January 31st of each year the indebtedness described herein remains outstanding, the Grantor will furnish Beneficiary with evidence satisfactory to Beneficiary that all taxes and assessments levied or assessed against the herein described property for the previous year have been paid in full.

23.    Grantor will not cause or permit the property or Grantor to be in violation of, or do anything or permit anything to be done which will subject the property to any remedial obligations under, any applicable environmental laws, including without limitation CERCLA, RCRA, the Texas Water Code and the Texas Solid Waste Disposal Act, assuming disclosure to the applicable governmental authorities of all relevant facts, conditions and circumstances if any, pertaining to the Properties and Grantor. Grantor will promptly notify the Beneficiary in writing of any existing, pending or, to the best of knowledge of Grantor, threatened investigation or inquiry by any governmental authority in connection with any applicable environmental law. Grantor shall obtain and maintain any permits, licenses or similar authorizations to construct, occupy, operate or use any buildings, improvements, fixtures and equipment forming a part of the property by reason of any applicable environmental laws.

24.    GRANTOR AGREES TO INDEMNIFY AND HOLD THE BENEFICIARY AND THE TRUSTEE (FOR PURPOSES OF THIS PARAGRAPH, THE TERMS "BENEFICIARY" AND "THE TRUSTEE" SHALL INCLUDE THE DIRECTORS, OFFICERS, PARTNERS, EMPLOYEES AND AGENTS OF THE BENEFICIARY AND THE TRUSTEE, RESPECTIVELY, AND ANY PERSONS OR ENTITIES OWNED OR CONTROLLED BY, OWING OR CONTROLLING, OR UNDER COMMON CONTROL OR AFFILIATED WITH THE BENEFICIARY AND THE TRUSTEE, RESPECTIVELY) HARMLESS FROM AND AGAINST, AND TO REIMBURSE THE BENEFICIARY AND THE TRUSTEE WITH RESPECT TO, ANY AND ALL CLAIMS, DEMANDS, LOSSES, DAMAGES (INCLUDING CONSEQUENTIAL DAMAGES), LIABILITIES, CAUSES OF ACTION, JUDGMENTS, PENALTIES, COST AND EXPENSES (INCLUDING

7

ATTORNEYS' FEES AND COURT COSTS) OF ANY KIND AND OF EVERY KIND OR CHARACTER, KNOWN OR UNKNOWN, FIXED OR CONTINGENT, IMPOSED ON AND ASSERTED AGAINST OR INCURRED BY THE BENEFICIARY AND/OR THE TRUSTEE AT ANY TIME AND FROM TIME TO TIME BY REASON OF, IN CONNECTION WITH OR ARISING OUT OF (A) THE FAILURE OF GRANTOR TO PERFORM ANY OBLIGATION HEREIN REQUIRED OR TO BE PERFORMED BY GRANTOR REGARDING APPLICABLE ENVIRONMENTAL LAWS, (B) ANY VIOLATION OF ANY APPLICABLE ENVIRONMENTAL LAW, AND (C) ANY AND ALL CLAIMS OR PROCEEDINGS (WHETHER BROUGHT BY PRIVATE PARTY OR GOVERNMENTAL AGENCY), BODILY INJURY, PROPERTY DAMAGE, ABATEMENT OR REMEDIATION, ENVIRONMENTAL DAMAGE OR IMPAIRMENT OR ANY OTHER INJURY OR DAMAGE RESULTING FROM OR RELATING TO ANY HAZARDOUS SUBSTANCE OR SOLID WASTE LOCATED UPON OR MIGRATING INTO, FROM OR THROUGH THE PROPERTIES. **WITHOUT LIMITATION, THE FOREGOING INDEMNITY SHALL APPLY TO EACH INDEMNIFIED PARTY WITH RESPECT TO CLAIMS, DEMANDS, LOSSES, DAMAGES (INCLUDING CONSEQUENTIAL DAMAGES), LIABILITIES, CAUSES OF ACTION, JUDGMENTS, PENALTIES, COST AND EXPENSES (INCLUDING ATTORNEYS' FEES AND COURT COSTS), WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE OF SUCH (AND/OR ANY OTHER) INDEMNIFIED PARTY. HOWEVER, SUCH INDEMNITY SHALL NOT APPLY TO ANY INDEMNIFIED PARTY TO THE EXTENT THE SUBJECT OF THE INDEMNIFICATION IS CAUSED BY OR ARISES OUT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PARTY.**

25. Notwithstanding anything to the contrary in this deed of trust, if any person executing this deed of trust is a "consumer" as defined in Regulation AA of the Board of Governors of the Federal Reserve System, 12 C.F.R. Part 227, or the Federal Trade Commission Credit Practices Rule, 16 C.F.R. Part 444, as applicable, no lien or security interest created or evidenced by this deed of trust shall extend to or cover a nonpossessory lien or security interest in "household goods", other than a purchase money lien or security interest in accordance with such regulations as applicable.

26. If all or all portion of the proceeds of the note are utilized to finance construction of improvements on the property, this is a "construction mortgage" within the meaning of Section 9.102(a)(55) and 9.334(h) of the "Uniform Commercial Code - Secured Transactions" of the State of Texas. This instrument secures an obligation for the construction of an improvement on land including the acquisition of the land.

27. Grantor agrees that without the prior written consent of Beneficiary, Grantor shall not transfer, sell, assign or convey, either in whole or in part, for use in connection with other property even though such property may be owned by Grantor any of the rights to utility availability applicable to the property granted by any city, municipal utility district or other governmental or quasi-governmental authority or any other utility capacity which may in the future while this deed of trust is in effect be available to the property. If there is utility availability to the property, Grantor acknowledges that without the availability of utilities to the property, the value of the property would be significantly diminished and that the extension of credit and the granting of financial accommodations herein described is based upon such availability. The Grantor further agrees that without the prior consent of Beneficiary, Grantor will neither consent to nor execute any documents to transfer, convey, assign, sell, or lease any mineral development rights on the Property to any person or entity. Grantor hereby agrees to immediately give written notice to Beneficiary of any action or proposed action to be taken in

8

connection with the development of mineral rights in, on around the Property and further agrees that if there is (i) any taking or damage to the Property and (ii) any reimbursement or compensation paid for such taking or damage, then such reimbursement or compensation shall be paid directly to the Beneficiary to be applied, at Beneficiary's option, to the balance of any indebtedness secured hereby.

28.    Beneficiary shall have all rights, remedies, and recourses granted in this deed of trust and the other loan documents and available at law or in equity, and the same (i) shall be cumulative and concurrent, (ii) may be pursued separately, successively, or concurrently against Grantor or others obligated for the indebtedness secured hereby or any part thereof, or against anyone or more of them, or against the property, at the sole discretion of Beneficiary, (iii) may be exercised as often as occasion therefore shall arise, it being agreed by Grantor that the exercise, discontinuance of the exercise of or failure to exercise any of the same shall in no event be construed as a waiver or release thereof or of any other right, remedy or recourse, and (iv) are intended to be, and shall be, not exclusive. All rights and remedies of Beneficiary hereunder and under the other loan documents shall extend to any period after the initiation of foreclosure proceedings, judicial or otherwise, with respect to the property.

29.    Whenever pursuant to this deed of trust, Beneficiary exercises any right given to it to approve or disapprove, or any agreement or term is to be satisfactory to Beneficiary, the decision of Beneficiary to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall, (except as is otherwise specifically herein provided) be in the sole discretion of Beneficiary and shall be final and conclusive.

30.    This deed of trust and the other loan documents shall be governed by and construed according to the laws of the State of Texas, except to the extent preempted by United States federal law.

31.    The rule of construction that ambiguities in an agreement will be construed against the party drafting it will not be applied in interpreting this deed of trust.

32.    Time is of the essence with respect to the obligations and responsibilities of the Grantor hereunder.

33.    Grantor agrees to provide, or cause to be provided, promptly to Beneficiary, all information reasonably requested by Beneficiary concerning the Property and the financial status, including, without limitation, financial statements and tax returns, of Grantor and of any other parties obligated on the indebtedness secured hereby. All such financial statements and other information must be in form and detail satisfactory to Beneficiary, in Beneficiary's sole and absolute discretion.

34.    Grantor and each surety, endorser, and guarantor of the note waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

35.    Grantor agrees to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Beneficiary's rights under this deed of trust if this deed of trust is placed in the hands of an attorney for enforcement.

36.    If any provision of this deed of trust is determined to be invalid or unenforceable, the validity or enforceability of any other provision will not be affected.

37.    **WAIVER OF DEFICIENCY STATUTE**

a.    In the event an interest in any of the Property is foreclosed upon pursuant to a judicial or nonjudicial foreclosure sale, Grantor agrees as follows. Notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code (as the same may be amended from time to time), and to the extent permitted by law, Grantor agrees that Beneficiary shall be entitled to seek a deficiency judgment from Grantor and

9

any other party obligated on the Note equal to the difference between the amount owing on the Note and the amount for which the Property was sold pursuant to judicial or nonjudicial foreclosure sale. Grantor expressly recognizes that this section constitutes a waiver of the above-cited provisions of the Texas Property Code which would otherwise permit Grantor and other persons against whom recovery of deficiencies is sought or Guarantor independently (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Property as of the date of the foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value. Grantor further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Property for purposes of calculating deficiencies owed by Grantor, Guarantor, and others against whom recovery of a deficiency is sought.

   b.    Alternatively, in the event the waiver provided for in subsection (a) above is determined by a court of competent jurisdiction to be unenforceable, the following shall be the basis for the finder of fact's determination of the fair market value of the Property as of the date of the foreclosure sale in proceedings governed by Sections 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time): (i) the Property shall be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or expectation that the Property will be repaired or improved in any manner before a resale of the Property after foreclosure; (ii) the valuation shall be based upon an assumption that the foreclosure purchaser desires a resale of the Property for cash promptly (but no later than twelve (12) months) following the foreclosure sale; (iii) all reasonable closing costs customarily borne by the seller in commercial real estate transactions should be deducted from the gross fair market value of the Property, including, without limitation, brokerage commissions, title insurance, a survey of the Property, tax prorations, attorneys' fees, and marketing costs; (iv) the gross fair market value of the Property shall be further discounted to account for any estimated holding costs associated with maintaining the Property pending sale, including, without limitation, utilities expenses, property management fees, taxes and assessments (to the extent not accounted for in (iii) above), and other maintenance, operational and ownership expenses; and (v) any expert opinion testimony given or considered in connection with a determination of the fair market value of the Property must be given by persons having at least five (5) years experience in appraising property similar to the Property and who have conducted and prepared a complete written appraisal of the Property taking into consideration the factors set forth above.

   38.    **THIS DEED OF TRUST AND THE OTHER LOAN DOCUMENTS EMBODY THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES HERETO AND SUPERSEDE ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES. THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES HERETO. THE PROVISIONS OF THIS DEED OF TRUST AND THE OTHER LOAN DOCUMENTS MAY BE AMENDED OR WAIVED ONLY BY INSTRUMENT IN WRITING SIGNED BY GRANTOR AND BENEFICIARY.**

   39.    It is expressly agreed that this deed of trust also secures Beneficiary in the

payment of any and all indebtedness, debts, obligations and liabilities of Grantor, Maker(s) or any or all of them, to Beneficiary, of whatever kind or character, whether now owing or hereafter arising (it being contemplated by Grantor, Maker(s) and Beneficiary that such future indebtedness may be incurred with Beneficiary having no obligation to loan such additional indebtedness and Grantor agreeing that any such indebtedness shall be secured by this deed of trust), whether direct or indirect, liquidated or unliquidated, secured or unsecured, fixed or contingent, primary or secondary, joint or several or both and including specifically, without limitation, any and all indebtedness, debts, obligations and liabilities (including, without limitation, any overdrafts) of Grantor, Maker(s) or any or all of them, (i) as principal, surety, endorser, guarantor, accommodation party or otherwise, (ii) arising by operation of law or otherwise, (iii) as a member of any partnership, joint venture, firm, trust or other association, or (iv) payable to or in favor of third parties whether heretofore or hereafter acquired, by whatever means, by Beneficiary, and furthermore including, specifically, without limitation, any and all renewals, extensions, rearrangements or modifications of any of the foregoing. Notwithstanding the foregoing provisions, this deed of trust shall not secure any such other loan, advance, debt, obligation or liability with respect to which Beneficiary is by applicable law prohibited from obtaining a lien on real estate, nor shall this provision operate or be effective to constitute or require any assumption or payment by any person, in any way, of any debt or obligation of any other person to the extent that same would violate or exceed the limit provided in any applicable usury or other law.

41.    The Grantor shall be entitled to have the Property released from the lien set forth in this Deed of Trust solely on the following terms and conditions, but not otherwise: (a) there shall be no right to a release while an event of default exists hereunder or under any of the loan documents executed in connection herewith or any event exists which with notice, passage of time, or both, would result in such an event of default, and (b) the Note in the amount of $3,850,000.00 has a current unpaid principal balance of less than $850,000.00.

42.    Notwithstanding the foregoing, including, without limitation, the provision set forth in paragraph 33, Grantor agrees to provide, or cause to be provided, the following: (i) on or before thirty (30) days after the end of each semi-annual calendar period, the statement of financial condition and cash flow statement for the Grantor; and (ii) tax returns for the Grantor for each fiscal year, as soon as available, but in no event later than one hundred twenty (120) days after the end of each fiscal year (provided, however, if any party shall have duly filed for an extension of the deadline for such tax return, and promptly furnishes evidence thereof to Beneficiary, then such tax return shall be delivered to Beneficiary on or before the two hundred fifty-five (255) days after the end of such fiscal year).

EXECUTED this ___30___ day of ___September___, 2009.

AMERICAN INTERNATIONAL INDUSTRIES,
INC., a Nevada Corporation

BY: _____
NAME: DANIEL DROR
TITLE: PRESIDENT

11

THE STATE OF TEXAS    §
                      §
COUNTY OF HARRIS      §

    This instrument was acknowledged before me on the $\underline{30}$ day of $\underline{September}$, 2009, by DANIEL DROR, as President of AMERICAN INTERNATIONAL INDUSTRIES, INC., a Nevada Corporation, on behalf of said corporation.

WILLIAM C. BARRETT
Notary Public, State of Texas
My Commission Expires
August 16, 2010

_____
Notary Public, State of Texas

082609.007

12

# EXHIBIT B

# LOAN SALE AGREEMENT

THIS LOAN SALE AGREEMENT (this "Agreement"), is entered into this 16th day of April, 2009, by and between TEXAS COMMUNITY BANK, N.A., a national banking association ("Seller"), and HAMMONDS TECHNOLOGIES, LLC, a Texas limited liability company ("Buyer"), and sets forth the terms and conditions whereby Seller agrees to sell and Buyer agrees to purchase the Loans identified herein.

WHEREAS Hammonds Technical Services, Inc. ("Borrower"), American International Industries, Inc. ("AII"), International American Technologies, Inc. ("IATI") and Carl L. Hammonds ("Hammonds") executed and delivered to Seller those certain notes (collectively, the "Notes"), guaranties (collectively, the "Guaranties"), security agreements (collectively, the "Security Agreements") and other loan documents more fully described on Exhibit A attached hereto (which, together with any and all other documents and instruments governing, evidencing, guaranteeing or securing or otherwise relating to payment of all or any part of the indebtedness evidenced by the Notes are herein collectively, the "Loan Documents").

WHEREAS, the liens, security interests and assignments of the Loan Documents are hereinafter collectively called the "Liens".

WHEREAS, Seller is the present legal and equitable and equitable owner and holder of the Notes, the other Loan Documents and the Liens.

WHEREAS, Buyer, subject to the terms and conditions of this Agreement, desires to purchase the Loans evidenced by the Notes and the other Loan Documents from Seller.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer hereby covenant agree as follows:

1.  Definitions.  Capitalized terms shall be defined as set forth in this Agreement, including Attachment 1 to this Agreement.

2.  Agreement to Purchase and Sell.  Subject to and in accordance with the terms and conditions of this Agreement, Seller hereby agrees to sell, assign, transfer and convey to Buyer on the Closing Date, and Buyer hereby agrees to purchase and accept on the Closing Date, AS IS, WHERE IS, WITHOUT REPRESENTATION, WARRANTY OR RECOURSE (except as expressly set out in this Agreement), all right, title, and interest of Seller, as of the Closing Date, in, to and under the Loans, as evidenced by the Notes and the other Loan Documents.

3.  Closing.  The Closing shall occur on or before the Closing Date at the office of Seller located at 1131 Uptown Park Boulevard, Suite 12, Houston, Texas 77056, provided, however, that the parties may agree to delivery of closing documents by hand, overnight delivery or mail.

4.  Payment of Purchase Price.  The purchase price (the "Purchase Price") for the Loans shall be the sum of $2,354,537.24.  The Purchase Price reflects (i) the sum of the unpaid principal balance of the Notes, accrued and unpaid interest on the unpaid principal balance of the

Notes and late fees owing as of the Closing Date, less (ii) a waiver of the late fees in the amount of $3,504.67 and a discount of $350,000.00.  On the Closing Date, Buyer shall pay the Purchase Price to Seller, either in cash or by wire transfer in immediately available funds.  All payments from any Debtor relating to the Loans, including principal and interest, made prior to the Closing shall belong to Seller.  All such payments made after the Closing shall belong to Buyer.

   5.     Conveyance.  Upon receipt of the Purchase Price, Seller shall sell, assign, transfer and convey the Loans to Buyer subject to and in accordance with the provisions of this Agreement.

   6.     Closing Documents.  On the Closing Date, (a) Seller shall deliver to Buyer the Assignment in the form attached hereto as Attachment 2, selling, assigning, transferring and conveying to Buyer all right, title and interest of Seller in, to and under the Loans, all on the terms and conditions set forth in this Agreement; (b) Seller shall deliver to Buyer the original Notes, endorsed to Buyer by Allonge in the form attached hereto as Attachment 3; (c) Seller shall, at Seller's sole cost and expense, prepare and submit to Buyer such other assignment(s), including UCC 3 assignment forms, necessary to record or file in the real property and UCC records of each jurisdiction where the Collateral is located in form and substance satisfactory to Buyer, and Seller shall execute and deliver the same to Buyer; (d) Seller shall deliver to Buyer the original Collateral Documents in Seller's Possession; and (e) Buyer shall execute and deliver to AIII and IATI a release of all of their obligations under the Loan Documents and any Collateral securing their obligations under the Loan Documents in the form attached hereto as Attachment 4 (collectively, the "Closing Documents").

   7.     Representations and Warranties of Buyer.  Buyer hereby represents and warrants as follows:

      7.1    Buyer is duly formed or organized, validly existing and in good standing under the laws of the jurisdiction of its formation or organization, and is registered or qualified to conduct business in all other jurisdictions in which the failure to be so registered or qualified would materially and adversely affect the ability of Buyer to perform its obligations hereunder.

      7.2    Buyer has the power and authority to execute, deliver and perform this Agreement, and has taken all necessary action to authorize such execution, delivery and performance.

      7.3    This Agreement constitutes the legal, valid and binding obligations of Buyer, enforceable against Buyer in accordance with its terms, except as limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws of general applicability relating to or affecting enforcement and general equitable principals which may limit the availability of equitable remedies, including without limitation, the remedy of specific performance.

      7.4    Buyer has made, independently, its own analysis of the Loan Documents for the purpose of acquiring same and has reviewed such documents and other information and materials as it considers appropriate to make necessary evaluations thereof.

      7.5    Buyer has conducted such due diligence review and analysis of the Loan Documents and any collateral securing same, together with such records as are generally

2.

available to the public from local, county, state and federal authorities as Buyer deemed necessary, proper or appropriate in order to make a complete and informed decision with respect to the purchase of the Loan Documents.

7.6    Buyer has fully and carefully evaluated the merits and risks inherent in the purchase of the Loan Documents, has retained the services of competent professionals, including, but not limited to, knowledgeable legal counsel to investigate the Loan Documents and the merits and risks of acquiring the Loan Documents.

7.7    Buyer has not been, and is not now, in a significantly disparate bargaining position in relationship to Seller in this transaction.

7.8    Buyer approached Seller about the acquisition of the Loan Documents, and initiated this transaction with Seller without any promotion or solicitation from Seller whatsoever.

7.9    Buyer is relying solely on its own investigation and has not relied, and is not relying, upon any information, documents, sales brochures, or other literature, maps or sketches, projection, pro forma, statement, representation, guarantee, or warranty (whether express or implied, oral or written, material or immaterial) that may have been given or made by, or on behalf of Seller.

7.10    Buyer acknowledges that the transfer of the Loan Documents by Seller pursuant to this Agreement shall be irrevocable and without any recourse to Seller.

7.11    Buyer has not relied upon any oral or written information provided by Seller or its personnel or agents other than the representations in this Agreement.

7.12    Buyer acknowledges that no employee or representative of Seller has been authorized to make, and that Buyer has not relied upon, any statements or representations or warranties other than those specifically contained in this Agreement.

7.13    Buyer understands that Seller is not and shall not be liable to Buyer for any prospective or speculative profits, or special, indirect or consequential damages, whether based upon contract, tort, or negligence, or in any other manner arising from this transaction.

7.14    Buyer is duly authorized and empowered to enter into this Agreement and to purchase the Loan Documents.

7.15    Buyer is acquiring the Loan Documents for commercial or business use or purposes.

7.16    Buyer, to the extent permitted by applicable law, hereby waives and relinquishes all rights, remedies, claims or causes of action, known or unknown, under the Texas Deceptive Trade Practices-Consumer Protection Act.

7.17    Buyer received from Seller the Loan Documents.

3

7.18.   Buyer understands that Seller would not sell the Loan Documents to Buyer but for Buyer's foregoing representations, and that Seller is relying upon the truth and accuracy of Buyer's representations.

8.      Seller's Representations, Warranties and Recourse.  Except as expressly provided herein, this sale is made without recourse against Seller, or representation or warranty by Seller, whether expressed, implied or imposed by law, of any kind or nature.  Seller has not, does not and will not make any representations or warranties with respect to the collectibility of the Loans or the value or condition of any of the Collateral subject to any Loan Document. Seller expressly disclaims any representation or warranty not contained in this Agreement.

8.1.   Representations and Warranties by Seller.  Seller hereby represents and warrants as follows:

8.1.1  Organization, Existence, Etc.  Seller is duly formed or organized, validly existing and in good standing under the laws of the jurisdiction of its formation or organization, and is registered or qualified to conduct business in all other jurisdictions in which the failure to be so registered or qualified would materially and adversely affect the ability of Seller to perform its obligations hereunder.

8.1.2  Authority, Enforceability, Etc.  Seller has taken all necessary action to authorize execution, delivery and performance of the Agreement and each of the Closing Documents to which it is a party. Assuming due authorization, execution and delivery by Buyer, the Closing Documents and all the obligations of Seller thereunder are the legal, valid and binding obligations of Seller enforceable in accordance with the terms of the Closing Documents, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

8.2    Representations and Warranties by Seller as to the Loans.  Seller hereby represents and warrants that, as to the Loans, the following representations and warranties are true and correct in all material respects as of the date hereof.

8.2.1  Title to Loan.  Seller has good title to the Loans, free and clear of any liens, claims, encumbrances or other charges whatsoever. The Loans are not subject to any prior assignment, conveyance, transfer or participation or agreement to assign, convey, transfer or participate, in whole or in part.

8.2.2  No Modification.  Seller has not modified the Notes or any of the other Loan Documents or satisfied, canceled or subordinated the Note or any of the other Loan Documents in whole or in part or released any of the Collateral from the Liens or executed any instrument of release, cancellation or satisfaction.

8.2.3  Borrower Subsidiaries. None of the following Borrower subsidiaries (i) have executed and delivered any Loan Documents to Seller, (ii) have any liability under any of the Loan Documents or any other documents evidencing any other indebtedness owing to Seller, or (iii) have pledged and/or assigned any of its real or personal property as collateral for the Loans or any other indebtedness owing to Seller:

      (i)      Hammonds Fuel Additives, Inc., a Texas corporation;

      (ii)     Hammonds Water Treatment Systems, Inc., a Texas corporation;

      (iii)    Hammonds ODV, Inc., a Texas corporation;

and, after Closing, Borrower shall not have any liability under any documents evidencing any indebtedness owing to Seller, and Seller will not have any liens or security interests on any real or personal property owned by Borrower as collateral for any indebtedness owing to Seller.

9.     Conditions Precedent to Closing.  The respective obligations of Seller and Buyer to complete the purchase and sale of the Loans pursuant to this Agreement are subject to the fulfillment on or prior to Closing Date of each of the following additional conditions, unless the same is specifically waived in writing by the party for whose benefit the same is to be fulfilled:

9.1    Performance of Covenants.  Seller and Buyer shall have performed all of their respective covenants and agreements contained herein which are required to be performed by them on or prior to the Closing Date.

9.2    Representations and Warranties.  All representations and warranties of Buyer and Seller set forth in this Agreement shall be true in all material respects at and as of the Closing Date.

10.    Seller Remedies.  If for any reason, Buyer, prior to or at the Closing, breaches or fails to perform any of Buyer's obligations under this Agreement or any of Buyer's representations contained herein prove to have been materially inaccurate as of the date made, then Seller shall be entitled exercise any and all rights, remedies and other relief available to Seller at law or in equity.

11.    Buyer's Remedies.  If for any reason, Seller, prior to or at the Closing, breaches or fails to perform any of Seller's obligations under this Agreement or any of Seller's representations contained herein prove to have been materially inaccurate as of the date made, then Buyer shall be entitled exercise any and all rights, remedies and other relief available to Buyer at law or in equity.

12.    Release.  In consideration of Seller's execution of this Agreement, Buyer, for itself and its, successors and assigns, does hereby release, acquit and forever discharge Seller, its predecessors, successors and assigns, all officers, directors, shareholders, and employees of Seller, and all the firms, persons, agents, corporations, or partnerships associated with Seller (collectively, the "Released Parties"), of and from any and all claims, liabilities, demands, injuries, rights, damages, costs, loss of services, expenses, compensations, actions, judgments and execution of whatsoever nature, whether in contract or in tort, statutory or otherwise, known or unknown, foreseen and unforeseen, actual, consequential, or incidental, which Buyer may have or claim to have, now or in the future, against the Released Parties, created by or arising out of the Note end/or Loan Documents, and the transaction contemplated by this Agreement.  Buyer acknowledges that but for this release, Seller would not enter into this Agreement.

13.   As Is.  BUYER TAKES THE LOAN DOCUMENTS "AS IS" AND WITH "ALL FAULTS." SELLER HAS NOT MADE AND DOES NOT MAKE ANY REPRESENTATIONS AS TO ANY MATTER AFFECTING OR RELATED TO NOTE, LOAN DOCUMENTS OR THIS AGREEMENT, EXCEPT AS SPECIFICALLY SET FORTH OR REFERRED TO HEREIN, AND BUYER HEREBY EXPRESSLY ACKNOWLEDGES THAT NO FURTHER REPRESENTATIONS HAVE BEEN MADE, EXCEPT AS SET FORTH HEREIN, SELLER EXPRESSLY DISCLAIMS AND BUYER ACKNOWLEDGES AND ACCEPTS THAT SELLER HAS DISCLAIMED TO THE MAXIMUM EXTENT PERMITTED BY LAW, ANY AND ALL REPRESENTATIONS, WARRANTIES OR GUARANTIES, OF ANY KIND, ORAL OR WRITTEN, EXPRESS OR IMPLIED, CONCERNING THE LOAN DOCUMENTS, INCLUDING WITHOUT LIMITATION, (i) THE VALUE, CONDITION, NEGOTIABILITY, MERCHANTABILITY, MARKETABILITY, COLLECTIBILITY, PROFITABILITY, SUITABILITY, OR FITNESS FOR A PARTICULAR USE OR PURPOSE OF THE NOTES OR LOAN DOCUMENTS; (ii) THE PAYMENT PERFORMANCE OF BORROWER; (iii) BORROWER'S, GRANTOR'S OR GUARANTORS' COMPLIANCE WITH COVENANTS OR CONDITIONS TO WHICH THEY ARE SUBJECT UNDER THE LOAN DOCUMENTS; AND (iv) THE QUALITY, PHYSICAL CONDITION OR TITLE STATUS OF THE PROPERTY. SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENTS, REPRESENTATIONS, OR INFORMATION PERTAINING TO THE NOTE OR LOAN DOCUMENTS FURNISHED BY ANY BROKER, AGENT, EMPLOYEE, SERVANT, OR OTHER PERSON, UNLESS THE SAME ARE SPECIFICALLY SET FORTH OR REFERRED TO HEREIN.  SELLER HAS NOT, DOES NOT AND WILL NOT MAKE ANY REPRESENTATIONS OR WARRANTIES WITH REGARD TO THE PROPERTY OR ITS COMPLIANCE WITH ANY LAWS, RULES, REGULATIONS, ORDERS, OR REQUIREMENTS, INCLUDING, BUT NOT LIMITED TO, THOSE PERTAINING TO THE HANDLING, GENERATING, TREATING, STORING, OR DISPOSING OF ANY HAZARDOUS WASTE OR SUBSTANCE.

14.   Notices.  All notices or deliveries required or permitted hereunder shall be in writing and shall be deemed given when personally delivered to the individual hereinafter designated or when actually received by means of facsimile transmission, overnight mail, or registered or certified mail, return receipt requested, at the following address, or such other address as either party may hereafter designate by notice given in compliance with this Section to the other party:

SELLER:        TEXAS COMMUNITY BANK, N.A.
               1131 Uptown Park Boulevard, Suite 12
               Houston, Texas 77056
               Attention:  Mr. Walter Beard
               Telephone: (713) 402-5405
               Facsimile: (713) 402-5401

HOU:0900000/40000:1390269v3                          6

|            |                                         |
|------------|-----------------------------------------|
| BUYER:     | **HAMMONDS TECHNOLOGIES, LLC**          |
|            | 6951 W. Little York                     |
|            | Houston, Texas 77040                    |
|            | Attention: Mr. Jim Morris               |
|            | Telephone: (832) 456-4509               |
|            | Facsimile: (713) 466-3470               |
|            |                                         |
| with a copy to: | **LOCKE LORD BISSELL & LIDDELL, LLP** |
|            | 3200 JPMorgan Chase Tower               |
|            | 600 Travis Street                       |
|            | Houston, Texas 77002                    |
|            | Attention: Douglas A. Yeager            |
|            | Telephone: (713) 226-1335               |
|            | Facsimile: (713) 223-3717               |

Any notice sent by fax must be confirmed by delivery of an original or hard copy on the next Business Day following transmission.

15.   Severability. Each part of this Agreement is intended to be severable. If any term, covenant, condition or provision hereof is unlawful, invalid, or unenforceable for any reason whatsoever, and such illegality, invalidity, or unenforceability does not affect the remaining parts of this Agreement, then all such remaining parts hereof shall be valid and enforceable and have full force and effect as if the invalid or unenforceable part had not been included.

16.   Construction. Unless the context otherwise requires, singular nouns and pronouns (including defined terms), when used herein, shall be deemed to include the plural and vice versa, and impersonal pronouns shall be deemed to include the personal pronoun of the appropriate gender.

17.   Binding Effect. This Agreement and the terms, covenants, conditions, provisions, obligations, undertakings, rights and benefits hereof, including any attachments hereto, shall be binding upon, and shall inure to the benefit of, the undersigned parties and their respective heirs, executors, administrators, representatives, successors, and assigns.

18.   Prior Understandings. This Agreement supersedes any and all prior discussions and agreements between Seller and Buyer with respect to the purchase of the Loans and other matters contained herein, and this Agreement contains the sole and entire understanding between the parties hereto with respect to the transactions contemplated herein. There are no oral agreements between the parties.

19.   Survival. Each and every covenant, term, representation, warranty and agreement made by Seller or Buyer in this Agreement shall survive the Closing and shall not merge into the Closing Documents, but instead shall be independently enforceable.

20.   Governing Law. TO THE EXTENT NOT CONTROLLED BY FEDERAL LAW, THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND

ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF TEXAS.

21.   Time of the Essence.  Time is of the essence of all provisions of this Agreement.

22.   Counterparts.  This Agreement may be executed in counterparts, each of which when executed and delivered shall be deemed to be an original, and all of which taken together shall constitute but one and the same instrument.

IN WITNESS WHEREOF, Buyer and Seller have duly executed, acknowledged and delivered this Agreement on the day and year first above written.

SELLER:

TEXAS COMMUNITY BANK, N.A.,
a national banking association

By: _Walter Beard_
Name: _Walter Beard_
Title: _President_

BUYER:

HAMMONDS TECHNOLOGIES, LLC,
a Texas limited liability company

By:     FahCorp, Inc.,
        a Texas corporation,
        its Member

        By: _____
        Name: _____
        Title: _____

IN WITNESS WHEREOF, Buyer and Seller have duly executed, acknowledged and delivered this Agreement on the day and year first above written.

SELLER:

TEXAS COMMUNITY BANK, N.A.,
a national banking association

By: _____
Name: _____
Title: _____

BUYER:

HAMMONDS TECHNOLOGIES, LLC,
a Texas limited liability company

By:     FabCorp, Inc.,
        a Texas corporation,
        its Member

        By: _____
        Name: J. Allan Kleiman
        Title: Vice President

LOAN SALE AGREEMENT
SIGNATURE PAGE

## ATTACHMENT I

### DEFINITIONS

"Assignment" means the Assignment of Note, Loan Documents, Liens and Security Instruments to be delivered by Seller to Buyer at Closing in the form of Attachment 2 to this Agreement with all blanks appropriately completed.

"Business Day" means any day other than a Saturday, Sunday or legal holiday in the State of Texas.

"Buyer" is defined in the preamble hereto, and shall also mean and include its successors and assigns.

"Closing" means the simultaneous performance by Seller and Buyer of the acts herein provided to be performed at the Closing for purposes of selling the Loans to Buyer.

"Closing Date" is defined as April 16, 2009, or such other date as Seller and Buyer may agree in writing.

"Closing Documents" is defined in Section 6 of this Agreement.

"Collateral" means the real and personal property securing the Loans.

"Collateral Document" means the deeds of trust, mortgages, security agreements, financing statements, guaranties, hazardous materials indemnities, and other agreements or documents, whether an original or a copy and whether or not similar to those enumerated, evidencing, securing, guarantying or otherwise documenting, evidencing, or giving notice of the Loans together with all renewals, modifications, amendments, restatements, consolidations, substitutes, replacements and extensions thereof, and any performance or payment obligations with respect thereto, and title insurance policies insuring the liens thereof.

"Debtor" means Borrower, AIII, IATI, Hammonds and each other person or entity who is liable for the payment or performance of all or any portion of the Loans or any Collateral Document relating to the Loans or who owns any property that is subject to (or purported to be subject to) a security interest or other lien which secures all or any portion of the Loans or any related Collateral Document.

"Loans" means the loan obligations and debt evidenced by the Notes and includes (a) the Notes; (b) all rights to payment and other rights, title and interests of Seller in, to and under the Notes, specifically including, all accrued interest and late charges; (c) each Collateral Document; (d) all rights, title, interest, powers, liens or security interest of Seller in, to or under each Collateral Document, including without limitation, claims and rights to and interests in proceeds of hazard or casualty insurance covering collateral securing such Loan, claims relating to any deficiency under the Loans, and awards in eminent domain and condemnation proceedings affecting such collateral.

"Seller" is defined in the preamble and recitals hereto and shall also mean and include its successors and assigns.

## EXHIBIT A

**$2,000,000.00 LOAN**

1. Revolving Note dated June 17, 2005, in the original principal amount of $2,000,000.00, executed by Borrower and payable to the order of Seller.

2. Security Agreement dated June 17, 2005, executed by Borrower, as debtor, and Seller, as secured party.

3. Guaranty dated June 17, 2005, executed by AIII, IATI and Hammonds in favor of Seller.

4. Loan Agreement dated June 17, 2005, executed by Borrower and Seller.

5. Environmental Risk Agreement dated June 17, 2005, executed by Borrower in favor of Seller.

6. Notice of Entire Agreement, Release of Claims and Waivers dated June 17, 2005, executed by Borrower, AIII, IATI, Hammonds and Seller.

7. Renewal, Extension and Modification Agreement ($2MM Renewal — Hammonds Technical Services, Inc.) dated February 26, 2007, executed by Borrower, IATI, AIII and Hammonds.

8. First Amended and Restated Loan Agreement dated February 26, 2007, executed by Borrower and Seller.

9. Security Agreement ($2MM Renewal) dated February 26, 2007, executed by Borrower, as debtor, and Seller, as secured party.

10. Guaranty ($2MM Renewal) dated February 26, 2007, executed by AIII, IATI and Hammonds in favor of Seller.

11. Deed of Trust and Security Agreement (With Absolute Assignment of Leases and Rents) (All Notes) dated February 26, 2007, executed by Borrower to James B. Ebrey, Trustee for the benefit of Seller.

12. Environmental Risk Agreement dated February 26, 2007, executed by Borrower, AIII, IATI and Hammonds in favor of Seller.

13. Notice of Entire Agreement, Release of Claims and Waivers ($2MM Renewal — Hammonds Technical Services, Inc.) dated June 17, 2005, executed by Borrower, AIII, IATI, Hammonds and Seller.

**$400,000.00 LOAN**

1. Term Note dated February 26, 2007, in the original principal sum of $400,000.00, executed by Borrower and payable to the order of Seller.

2. Loan Agreement ($400K Note) dated February 26, 2007, executed by Borrower and Seller.

3. Security Agreement ($400K Note) dated February 26, 2007, executed by Borrower, as debtor, and Seller, as secured party.

4. Guaranty ($400K Note) dated February 26, 2007, executed by AIII, IATI and Hammonds in favor of Seller.

5. Environmental Risk Agreement dated February 26, 2007, executed by Borrower, AIII, IATI and Hammonds in favor of Seller.

6. Deed of Trust and Security Agreement (With Absolute Assignment of Leases and Rents) (All Notes) dated February 26, 2007, executed by Borrower to James B. Ebrey, Trustee for the benefit of Seller.

7. Notice of Entire Agreement, Release of Claims and Waivers ($400K Note – Hammonds Technical Services, Inc.) dated February 26, 2007, executed by Borrower, AIII, IATI, Hammonds and Seller.

8. Universal Note dated April 26, 2006, in the original principal sum of $400,000.00, executed by Borrower and payable to the order of Lender.

9. Commercial Security Agreement dated April 26, 2006, executed by Borrower, as debtor, and Seller, as secured party.

10. Commercial Security Agreement dated April 26, 2006, executed by AIII, as debtor, and Seller, as secured party.

11. Guaranty dated April 26, 2006, executed by AIII in favor of Seller.

12. Guaranty dated April 26, 2006, executed by IATI in favor of Seller.

13. Guaranty dated April 26, 2006, executed by Hammonds in favor of Seller.

14. Disclaimer of Oral Agreements dated April 26, 2006, executed by Borrower and Seller.

**$243,246.98 LOAN**

1. Promissory Note (Equipment Note) dated February 26, 2007, in the original principal sum of $243,246.98, executed by Borrower and payable to the order of Seller.

4

2.    Loan Agreement (Equipment Note) dated February 26, 2007, executed by Borrower and Seller.

3.    Security Agreement (Equipment Note) dated February 26, 2007, executed by Borrower, as debtor, and Seller, as secured party.

4.    Guaranty (Equipment Note) dated February 26, 2007, executed by AIII, IATI and Hammonds in favor of Seller.

5.    Deed of Trust and Security Agreement (With Absolute Assignment of Leases and Rents) (All Notes) dated February 26, 2007, executed by Borrower to James B. Ebrey, Trustee for the benefit of Seller.

6.    Environmental Risk Agreement dated February 26, 2007, executed by Borrower, AIII, IATI and Hammonds in favor of Seller.

7.    Notice of Entire Agreement, Release of Claims and Waivers (Equipment Note — Hammonds Technical Services, Inc.) dated February 26, 2007, executed by Borrower, AIII, IATI, Hammonds and Seller.

## $100,000.00 LOAN

1.    Universal Note dated April 3, 2006, in the original principal sum of $100,000.00, executed by Borrower and payable to the order of Seller.

2.    Commercial Security Agreement dated April 3, 2006, executed by Borrower, as debtor, and Seller, as secured party.

3.    Commercial Security Agreement dated April 3, 2006, executed by AIII, as debtor, and Seller, as secured party.

4.    Commercial Security Agreement dated April 3, 2006, executed by IATI, as debtor, and Seller, as secured party.

5.    Guaranty dated April 3, 2006, executed by AIII in favor of Seller.

6.    Guaranty dated April 3, 2006, executed by IATI in favor of Seller.

7.    Guaranty dated April 3, 2006, executed by Hammonds in favor of Seller.

## $41,303.89 LOAN

1.    Universal Note dated April 17, 2007, in the original principal sum of $41,303.89, executed by Borrower and payable to the order of Seller.

2.  Commercial Security Agreement dated April 17, 2007, executed by Borrower, as debtor, in favor of Seller, as secured party, covering and affecting a 2007 Nissan Armada VIN# 5N1BA08A27N717799.

3.  Guaranty dated April 17, 2007, executed by Hammonds in favor of Seller.

HOU:0900000/40000:1390269v5

## ATTACHMENT 2

## ASSIGNMENT OF NOTES, LOAN
## DOCUMENTS, LIENS AND SECURITY INSTRUMENTS

### RECITALS

A.     TEXAS COMMUNITY BANK, N.A., a national banking association ("ASSIGNOR"), desires to assign the Notes (hereinafter defined) together with all right, title and interest it has in the Assigned Documents (hereinafter defined) to HAMMONDS TECHNOLOGIES, LLC, a Texas limited liability company ("ASSIGNEE").

B.     The term "Assigned Documents", as used herein, shall mean the promissory notes (the "Notes") being more particularly described on Exhibit A attached hereto and made a part hereof for all purposes, together with ASSIGNOR's right, title and interest in, to and under any and all documents described on Exhibit B attached hereto and made a part hereof for all purposes. The term Assigned Documents shall also include ASSIGNOR's right, title and interest in all mortgagee's policies of title insurance, casualty, hazard and liability insurance, and escrow accounts executed or delivered to ASSIGNOR, or which ASSIGNOR has the right to have delivered to it, in connection with or pertaining to any or all of the Assigned Documents.

### ASSIGNMENT

ASSIGNOR, for good and valuable consideration received from ASSIGNEE, the receipt and sufficiency of which are hereby acknowledged, has, subject as hereinafter provided, TRANSFERRED, ASSIGNED, GRANTED and CONVEYED and by these presents does TRANSFER, ASSIGN, GRANT AND CONVEY unto ASSIGNEE, its successors and assigns, the Notes, all obligations evidenced by the Notes, and all of ASSIGNOR's rights, title and interest in and to the Assigned Documents and all rights, powers, security interests and other liens arising under any Assigned Document.

THE ASSIGNMENT MADE HEREBY IS WITHOUT RECOURSE, REPRESENTATION OR WARRANTY (EXCEPT TO THE EXTENT STATED IN THAT CERTAIN LOAN SALE AGREEMENT (THE "AGREEMENT") DATED AS OF APRIL 16, 2009, BETWEEN ASSIGNOR AND ASSIGNEE AND IS SUBJECT TO THE TERMS AND CONDITIONS OF SUCH AGREEMENT. SAID AGREEMENT IS INCORPORATED HEREIN BY REFERENCE FOR ALL PURPOSES.

EXECUTED this _16th_ day of April, 2009.

ASSIGNOR:

TEXAS COMMUNITY BANK, N.A.,
a national banking association

By: _Walter Beard_
Name: _Walter Beard_
Title: _President_

ACCEPTED BY ASSIGNEE:

HAMMONDS TECHNOLOGIES, LLC,
a Texas limited liability company

By:     FabCorp, Inc.,
        a Texas corporation,
        its Member

        By: _____
        Name: _____
        Title: _____

STATE OF TEXAS              §
                           §
COUNTY OF HARRIS            §

This instrument was acknowledged before me on the _16_ day of April, 2009, by
_Walter Beard_ , a _President_ of TEXAS COMMUNITY BANK, N.A., a
national banking association, on behalf of said association

(SEAL)

                           Notary Public in and for the State of Texas
                           Printed Name of Notary: _____
                           My Commission Expires: _____

Karen A Smith
Notary Public, State of Texas
My Commission Expires:
August 28, 2009

**EXECUTED** this _____ day of April, 2009.

**ASSIGNOR:**

TEXAS COMMUNITY BANK, N.A.,
a national banking association

By: _____
Name: _____
Title: _____

**ACCEPTED BY ASSIGNEE:**

HAMMONDS TECHNOLOGIES, LLC,
a Texas limited liability company

By:    FabCorp, Inc.,
       a Texas corporation,
       its Member

By: _____
Name: J. Allan Lehman
Title: Vice President

STATE OF TEXAS                    §
                                  §
COUNTY OF HARRIS                  §

        This instrument was acknowledged before me on the _____ day of April, 2009, by
_____, a _____ of TEXAS COMMUNITY BANK, N.A., a
national banking association, on behalf of said association

(SEAL)

                                  _____
                                  Notary Public in and for the State of Texas
                                  Printed Name of Notary: _____
                                  My Commission Expires: _____

STATE OF TEXAS                              §
                                           §
COUNTY OF HARRIS                           §

 This instrument was acknowledged before me on the _15th_ day of April, 2009, by
J. Allen Nohr, _Vice President_ of FabCorp, Inc., a Texas corporation, in its
capacity as Member of HAMMONDS TECHNOLOGIES, LLC, a Texas limited liability
company, on behalf of said limited liability company.

(SEAL)

_____
Notary Public in and for the State of Texas
Printed Name of Notary: _Shelly Levy_
My Commission Expires: _7-28-72_

SHELLY LEVY
Notary Public, State of Texas
My Commission Expires 07-28-2012

## ATTACHMENT 3

### ALLONGE

Pay to the order of HAMMONDS TECHNOLOGIES, LLC ("Assignee"), WITHOUT RECOURSE, REPRESENTATION OR WARRANTY (EXCEPT TO THE EXTENT STATED IN THAT CERTAIN LOAN SALE AGREEMENT (THE "AGREEMENT") DATED AS OF APRIL 16, 2009, BETWEEN ASSIGNOR AND ASSIGNEE AND IS SUBJECT TO THE TERMS AND CONDITIONS OF SUCH AGREEMENT. SAID AGREEMENT IS INCORPORATED HEREIN BY REFERENCE FOR ALL PURPOSES.

**ASSIGNOR:**

TEXAS COMMUNITY BANK, N.A.,
a national banking association

By: _Walter Beard_

Name: _Walter Beard_

Title: _President_

HOU:0900000/40000:1390269v5

Jan 25, 2010

8:38 am

# American Int'l Industries Inc.

Page  1

## Account Detail

Current fiscal year: Thursday, January 01, 2009 through Thursday, December 31, 2009)

Sorted By: Posting Date

| Account # / Reference No. / Description | | Date | Debits | Credits | Balance |
|---|---|---|---|---|---|
| 9312.000 | Discontinued operations – Hammonds | | | | 0.00 |
| C/D Chg  495 | Hammonds Note 7016058 | 04/17 | 49999.97 | | |
| GEN SLC441 | Clsd AIII CD 4081238 | 04/17 | 300000.00 | | |
| | $300k for Hammonds | | | | |
| | deconsolidation. | | | | |
| | **** Ending Balance | | 349999.97 | 0.00 | 349999.97 |